993 A.2d 1229 (2010)
413 N.J. Super. 171
Moses SEGAL, Individually, E.S., a Minor by Her Guardian ad Litem, Moses Segal, and W.S., a Minor by His Guardian ad Litem, Moses Segal, Plaintiffs-Appellants,
v.
Cynthia LYNCH, an Individual, Defendant-Respondent.
DOCKET NO. A-0805-08T2
Superior Court of New Jersey, Appellate Division.
Argued January 5, 2010.
Decided May 3, 2010.
*1232 Steven M. Resnick, Short Hills, argued the cause for appellants (Budd Larner, attorneys; Mr. Resnick, of counsel and on the brief; Christopher R. Paldino, on the brief).
Helen A. Nau, Newark, argued the cause for respondent (Krovatin Klingeman, attorneys; Ms. Nau, on the brief).
Before Judges FUENTES, GILROY and SIMONELLI.
The opinion of the court was delivered by FUENTES, J.A.D.
This appeal requires us to determine whether the tort of intentional infliction of emotional distress is a cognizable cause of action when the supporting factual allegations are rooted in the parent-child relationship. Specifically, plaintiff, the father *1233 of two minor children, filed a complaint in the Law Division alleging on his own behalf, and as guardian ad litem for the children, that defendant, the children's mother, intentionally or recklessly engaged in extreme and outrageous conduct designed to poison his relationship with his children, which alienated the natural bond and affection that should exist between them and caused both he and the children emotional distress.
The trial court dismissed plaintiff's complaint as a matter of law pursuant to Rule 4:6-2(e), finding that the facts alleged therein failed to state a claim upon which relief could be granted. The trial court's ruling was based primarily on the proscriptions codified in N.J.S.A. 2A:23-1, otherwise referred to here as the Heart Balm Act. Independent of this statutory impediment, the trial judge also found that plaintiff's action was precluded by the Entire Controversy Doctrine because the allegations forming the basis of this civil complaint should have been raised as part of a Family Part action filed by plaintiff in 2006. Finally, accepting arguendo all of the factual allegations in plaintiff's complaint as true, the court found that plaintiff failed, as a matter of law, to state a cognizable claim for intentional or negligent infliction of emotional distress. Additionally, acting on defendant's application for the imposition of sanctions under the frivolous litigation law, N.J.S.A. 2A:15-59.1 and R. 1:4-8, the trial court found plaintiff had brought this action in bad faith and awarded defendant counsel fees in the amount of $42,912.50.
Plaintiff now argues that the trial court erred in finding that his cause of action for intentional infliction of emotional distress was barred under the Heart Balm Act. He also argues that the motion judge improperly made credibility findings against him based only on the parties' history of litigation, and thereafter, used those findings as a basis to dismiss his complaint and impose sanctions against him under the frivolous litigation law.
After carefully reviewing the record before us, we affirm the judgment of the trial court dismissing plaintiff's complaint. We do so, however, for reasons other than those expressed by the trial court. Aquilio v. Continental Ins. Co., 310 N.J.Super. 558, 561, 709 A.2d 231 (App.Div.1998). We are satisfied that the Heart Balm Act does not bar plaintiff's claim because the statute's prohibitions were intended to apply only to causes of action alleging alienation of affection arising out of and dependent upon a marital relationship.
We acknowledge with equal force, however, that plaintiff's cause of action raises profound questions of public policy concerning the propriety of permitting a parent to utilize a child's loss of affection for him or her as grounds for civil liability against the other parent. On its face, such a cause of action has the potential to deteriorate into an abusive process; it can be wielded like a sword by an emotionally distraught parent with little to no consideration of how the litigation will affect the child. Most alarming is the potential for great harm such a cause of action would pose to the child.
Our overarching consideration in all matters concerning children involved in the judicial system is "the best interests of the child." This principle is embedded in the doctrine of parens patriae, which authorizes the court to intervene when necessary to prevent harm to the child. Application of this principle to the case at hand leads us to one inexorable conclusion: plaintiff's cause of action for intentional infliction of emotional distress must be barred as inimical to and irreconcilable with the best interests of the children involved in this suit.
*1234 Despite this holding, we reverse the imposition of sanctions under the frivolous litigation framework because plaintiff advanced a good faith argument in support of his legal position in a novel, complex, and heretofore relatively unexplored area of the law.

I
Because the trial court dismissed plaintiff's complaint as a matter of law, we recite all of the relevant factual allegations in the light most favorable to plaintiff. R. 4:6-2(e).
The parties never married. They lived together in Toronto, Canada for approximately six years and had two children during their relationship: a girl, born in 1994, and a boy, born in 1998. The parties physically separated in 2001, but continued to reside within blocks of each other in Toronto; the children resided with their mother, and plaintiff, by his own admission, enjoyed frequent and liberal contacts with his children during the time he remained in Toronto.
Plaintiff moved to New Jersey in 2003. According to him, after the move, defendant "refused to establish a schedule of parenting time," which limited most of his interactions with the children to email messages and telephone calls. Despite what he characterized as defendant's "obstructive efforts," plaintiff concedes that he continued to enjoy a relationship with his children after his relocation to this State. Although no set schedule was established, plaintiff saw the children approximately every two weeks from June 2005 to June 2006. He did not seek judicial intervention to increase his contacts with the children during this time period.[1]
Conversely, defendant brought an action in the Superior Court of Justice in the City of Toronto seeking custody of the children, financial support from plaintiff for herself and the children, and to compel plaintiff to pay to her a portion of the proceeds from the sale of certain properties owned by the parties. By order entered June 20, 2005, the Canadian court granted defendant custody of the children and ordered plaintiff to pay: (1) a lump sum award of child and "spousal"[2] support in the amount $8,350,747 in Canadian currency (CDN); (2) child support arrears in the amount of $378,135.77 CDN; (3) a debt owed by plaintiff to defendant in the amount of $1,445,664.99 CDN; and (4) defendant's share of proceeds from the sale of their home in Lyford Cay, Bahamas, in the amount of $963,084. CDN. The award totaled $11,137,631.76 CDN.
In June 2006, defendant relocated to New Jersey, changed her telephone number, and terminated all contact and communication between plaintiff and his children. Specifically, defendant blocked all of plaintiff's emails and forbade the children from emailing or otherwise contacting their father. As a result, plaintiff did not have any contact with the children for over three months. Plaintiff alleges, "[u]pon information and belief," that defendant used this time period to alienate the *1235 children from him "by telling them false and spiteful things about their father."
Through a private investigator, plaintiff learned where defendant and the children had relocated and that the children had been enrolled in the local school district under their mother's surname. Plaintiff filed a complaint in the Family Part seeking "various injunctive relief" including "resumption of parental time and contact with the children." The Family Part granted plaintiff supervised visitation commencing in October of 2006.
According to plaintiff, "[o]nce visitation resumed, it became apparent to [him] that defendant's actions had a negative impact on his relationship with the children." Plaintiff further claimed that a court-appointed psychologist determined that defendant engaged in "alienating behavior with the children." The record before us does not include a report from this psychologist verifying plaintiff's claim.
Against this factual backdrop, plaintiff, for himself and on behalf of the parties' two minor children, filed a complaint against defendant for intentional and negligent infliction of emotional distress.
The matter first came before the trial court by way of defendant's motion to dismiss plaintiff's complaint in lieu of an answer pursuant to Rule 4:6-2. After noting the parties' repeated references to the history of litigation involving both the Canadian case and the action in the Family Part, the court decided to review defendant's motion to dismiss under the standard applicable to a motion for summary judgment. R. 4:46-2. Thus, accepting plaintiff's allegations as true and giving him all favorable inferences therefrom, the trial court granted defendant's motion to dismiss, finding that plaintiff had not presented a legally cognizable cause of action.
The trial court based its ruling on three legally independent grounds: (1) plaintiff's cause of action was barred by the Heart Balm Act; (2) the facts alleged by plaintiff in the complaint failed to state a claim of intentional or negligent infliction of emotional distress as a matter of law; and (3) the case was barred by the Entire Controversy Doctrine, Rule 4:30A and Rule 5:1-2(a), because plaintiff could have raised these same issues in the context of the Family Part action.

II
Although we agree with the trial court that plaintiff has not brought forth a legally cognizable cause of action, we are satisfied that such a bar is not predicated upon the proscriptions codified in the Heart Balm Act. Our authority to preclude this cause of action in this context emanates from our parens patriae responsibility, which authorizes the court to intervene where it is necessary to prevent harm to a child. Fawzy v. Fawzy, 199 N.J. 456, 474-75, 973 A.2d 347 (2009).

A
We first address the inapplicability of the Heart Balm Act. Commencing after June 27, 1935, the Legislature formally abolished "[t]he rights of action formerly existing to recover sums of money as damage for the alienation of affections, criminal conversation [adultery],[3] seduction or breach of contract to marry." N.J.S.A. 2A:23-1. Known collectively as the Heart Balm Act, these statutes also: prohibited actions to recover damages for breach of a contract to marry, or to otherwise sue for enforcement of such a contract, N.J.S.A. 2A:23-2; rendered "unlawful" the filing, service, or even the threat *1236 to serve any pleadings "seeking to recover a sum of money upon any cause of action abolished or barred by this chapter," N.J.S.A. 2A:23-3; voided all "contracts and instruments ... executed within the State in payment, satisfaction, settlement or compromise of any claim or cause of action abolished or barred by" the Act, N.J.S.A. 2A:23-4; and made a violation of these proscriptions a "misdemeanor," punishable by a fine not to exceed $1,000, imprisonment for no more than one year, or both, N.J.S.A. 2A:23-5. Thus, the theme of the Act is the abolishment of the common law right to recover damages for conduct which undermines the conjugal rights associated with marriage, such as the breach of a promise to marry or the tort of alienation of affection, proximately caused by the actions of a third party.
The Heart Balm Act has been found to preclude a cause of action seeking damages for lost services and emotional distress brought by the father of an adult woman who was seduced and became pregnant under a promise to marry. Magierowski v. Buckley, 39 N.J.Super. 534, 121 A.2d 749 (App.Div.1956). Writing for the panel in Magierowski, Judge Goldmann emphasized that the Act was intended to eliminate the "abuses attending the so-called `heart balm' actionsalienation of affections, criminal conversation, seduction and breach of promise to marry." Id. at 547, 121 A.2d 749. By the time the Act was passed,
[t]he public had come to look upon "heart balm" suits as devices for extracting large sums of money without proper justification. They were a fruitful source of coercion, extortion and blackmail. Manufactured suits, with their always present threat of publicity, were often used to force a settlement. Thus, an unscrupulous and unprincipled father could threaten to sue, or actually sue, a reputable or wealthy or important member of the community for an alleged act of seduction, timing his action so as to coincide with an important event in the man's life, such as the forthcoming announcement of his engagement, marriage, or his candidacy for public office. If the person charged stood his ground and went to court, he was faced with proof of damages grossly magnified to catch the sympathy of the jury. And juries were generally very liberal in their awards in seduction cases.
[Ibid.]
The Magierowski court's characterization of the Act's purpose was expressly supported by the statement of policy set out in the preamble to L. 1935, c. 279, the bill that formed the basis for the actual statute:
Whereas, [t]he remedies herein provided for by law for the enforcement of actions based upon alleged alienation of affections, criminal conversation[,] seduction and breach of contract to marry have been subjected to grave abuses, causing extreme annoyance, embarrassment, humiliation and pecuniary damage to many persons wholly innocent and free of any wrongdoing, who were merely the victims of circumstances, and such remedies having been exercised by unscrupulous persons for their unjust enrichment and such remedies having furnished vehicles for the commission or attempted commission of crime and in many cases have resulted in the perpetration of frauds, it is hereby declared as the public policy of the State of New Jersey that the best interests of the people of the State will be served by the abolition of such remedies. Consequently, in the public interest, the necessity for the enactment of this article is hereby declared as a matter of legislative determination.
[Id. at 548, 121 A.2d 749.]
*1237 By contrast, in Grobart v. Grobart, 5 N.J. 161, 74 A.2d 294 (1950), the Court found the Heart Balm Act inapplicable to an action sounding in slander and libel brought by a wife against third parties who allegedly conspired to cause her husband to abandon the marital residence and seek a divorce based on her alleged adultery. The plaintiff claimed that her brothers and sisters-in-law wickedly and maliciously conspired to injure her "in her marital relationship with her husband." Id. at 163-64, 74 A.2d 294. The plaintiff in Grobart accused the defendants of the following wrongs: (1) depriving her of her rights in personal and real property; (2) preventing her from obtaining judicially ordered maintenance from her husband; (3) forcing her to settle a claim she had against a municipality for less than its true value; (4) inducing her husband to file a divorce action against her based on adultery; (5) forcing her to file for divorce based on desertion; (6) requiring her to spend $10,000 in counsel fees related to her marital dispute; and (7) impairing her "good name and reputation." Id. at 164, 74 A.2d 294.
In concluding that the plaintiff's cause of action was not barred by the Heart Balm Act as a suit for alienation of affection, the Grobart Court emphasized that:
The gist or gravamen of the action for alienation of affections is the loss of consortium by which term is meant loss of the marital affections, comfort, society, assistance and services of a spouse who has been wrongfully enticed away and the damages recoverable are peculiarly referable thereto. The action is one in tort and the substance of this remedy is not the destruction of affection per se but loss of the conjugal society with its mutual rights and obligations directly referable thereto.
[Id. at 165, 74 A.2d 294.]
By contrast, the plaintiff's complaint was
not based upon the marriage relationship itself. The gravamen of this pleading is not laid in alienation of affections but rather in conspiracy to perpetrate wrongs that have no relation whatever to the interdictions of the [Heart Balm Act] and recovery is not sought for loss of the conjugal society and services of the plaintiff's husband.
[Id. at 166-67, 74 A.2d 294].
The reasoning in Grobart was applied and extended by the Chancery Division to permit a cause of action for intentional infliction of emotional distress brought by a man against his wife's paramour. C.M. v. J.M., 320 N.J.Super. 119, 125, 726 A.2d 998 (Ch.Div.1999). The claimant in C.M. sought to recover economic and emotional distress damages after discovering that the person he believed to be his biological child was actually fathered by his wife's paramour. Id. at 122-23, 726 A.2d 998. Citing Kleinow v. Ameika, 19 N.J.Super. 165, 166, 168, 88 A.2d 31 (Law Div.1952), in which the trial court dismissed a wife's third-party complaint claiming alienation of affection against her husband's paramour for enticing him away from her and his children, the paramour in C.M. argued that J.M.'s claim was similarly barred under the Heart Balm Act. C.M., supra, 320 N.J.Super. at 126, 726 A.2d 998. In rejecting this argument, the court in C.M. held that the claimant was seeking "damages for his splintered relationship with his alleged children, not for his dissolved marital relationship." Ibid.
We are thus satisfied that the Heart Balm Act does not bar plaintiff's cause of action for intentional infliction of emotional distress. Plaintiff's allegations of alienation are not predicated on the loss of a conjugal relationship with defendant. Plaintiff alleges that defendant, as the *1238 mother of his two children, has engaged in conduct intended to alienate him from the love and affection of his children. None of the underlying principles that support the adoption of the Heart Balm Act as explained in Grobart and Magierowski are implicated here.

B
We turn next to the question of whether plaintiff's cause of action is otherwise cognizable under the current state of the common law. In abolishing inter-spousal immunity in Merenoff v. Merenoff, 76 N.J. 535, 557, 388 A.2d 951 (1978), the Court lifted the bar that prevented one spouse from suing the other for injuries proximately caused by the conduct of his or her spouse. The following year the Court clarified
that the abolition of the doctrine pertained to tortious conduct generally encompassing not only conventional negligence but also intentional acts, as well as other forms of excessive behavior such as gross negligence, recklessness, wantonness, and the like. The only kind of marital conduct excepted from the abolition was that involving marital or nuptial privileges, consensual acts and simple, common domestic negligence, to be defined and developed on a case-by-case approach.
[Tevis v. Tevis, 79 N.J. 422, 426-27, 400 A.2d 1189 (1979) (internal citation omitted).]
In Giovine v. Giovine, 284 N.J.Super. 3, 13, 663 A.2d 109 (App.Div.1995), we recognized the right of a woman diagnosed with battered woman syndrome
to sue her spouse in tort for the physical and emotional injuries sustained by continuous acts of battering during the course of the marriage, provided there is medical, psychiatric, or psychological expert testimony establishing that the wife was caused to have an "inability to take any action to improve or alter the situation unilaterally."
Although not explicitly stated, we also acknowledged in Giovine a spouse's right to other forms of relief available through traditional tort claims sounding in negligence and intentional infliction of emotional distress, where the measure of damages is not dependent upon a physical injury, but can be established through competent evidence showing the defendant's outrageous or otherwise actionable conduct:
It is therefore clear that plaintiff must be permitted to present proofs of all acts of cruelty which occurred during the course of her marriage to defendant. Those prior acts may be offered to prove plaintiff's cause of action for divorce predicated on the grounds of extreme cruelty, or they may be offered as relevant evidence in conjunction with plaintiff's claim for damages attributable to battered woman's syndrome, intentional infliction of emotional distress and negligence.

[Id. at 22, 663 A.2d 109 (emphasis added).]
Two trial court opinions have also recognized the existence of a cause of action for intentional infliction of emotional distress brought by one spouse against the other. Ruprecht v. Ruprecht, 252 N.J.Super. 230, 599 A.2d 604 (Ch.Div.1991); C.M., supra, 320 N.J.Super. at 122, 726 A.2d 998.[4]
*1239 We thus see no legal impediment in permitting one spouse to bring an action against the other which asserts only emotional distress as the measure of damages. The underlying conduct that may give rise to such a cause of action must be consistent with the established definition of the alleged tort. In the case of intentional infliction of emotional distress:
[T]he plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe. Initially, the plaintiff must prove that the defendant acted intentionally or recklessly. For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress. Liability will also attach when the defendant acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow.
Second, the defendant's conduct must be extreme and outrageous. The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Third, the defendant's actions must have been the proximate cause of the plaintiff's emotional distress. Fourth, the emotional distress suffered by the plaintiff must be "so severe that no reasonable [person] could be expected to endure it."
[Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 366, 544 A.2d 857 (1988) (internal citations omitted).]

III
The question before us, however, raises issues that have not been directly addressed in any reported decision in this State. Specifically, this court must examine whether the father of two minor children may file a complaint in the Law Division alleging on his own behalf, and as guardian ad litem for his children, that the children's mother has intentionally or recklessly engaged in extreme and outrageous conduct designed to poison his relationship with his children, thus alienating the natural bond and affection that should exist between them and thereby causing both he and the children emotional distress. Consistent with our parens patriae responsibility, and guided by the best interests of the child standard, we are compelled to answer in the negative.
In Fawzy, our Supreme Court addressed the question of
whether parties to a matrimonial action may agree to submit questions regarding child custody and parenting time to binding arbitration, and if so, what standard of review will apply. More particularly, we have been asked by a matrimonial litigant to declare arbitration of issues involving children an affront to the exercise of our parens patriae jurisdiction. Alternatively, we have been requested to establish a best-interests standard as the basis for judicial intervention into an otherwise binding arbitration award.
[Fawzy, supra, 199 N.J. at 461, 973 A.2d 347.]
In addressing this question, the Court was compelled to balance the constitutionally protected right of parental autonomy, which includes the right to select the forum in which to adjudicate disputes concerning child custody and rearing, id. at 461-62, 973 A.2d 347, against the court's obligation, under the doctrine of parens patriae, to intervene where it is necessary *1240 to prevent harm to the child. Id. at 474-75, 973 A.2d 347. The Court diffused this tension by upholding a parent's constitutional right to choose the forum through which to adjudicate "any family controversy, including one regarding child custody and parenting time," tempered by the best interests of the child as a standard of review for arbitration awards in which a party claims "adverse impact or harm to the child." Id. at 477-78, 973 A.2d 347.
In Fawzy, the Court defined the doctrine of parens patriae as the capacity of the state to care for and protect those unable to do so for themselves such as children. Id. at 474 n. 3, 973 A.2d 347. In so doing, the Court recognized the doctrine's "deep roots," tracing its origins "back to the Book of Genesis." Ibid. The authority and responsibility of the court to protect children in their role as civil litigants is well-settled. Hojnowski v. Vans Skate Park, 187 N.J. 323, 333-34, 901 A.2d 381 (2006); R. 4:44-1. Additionally, under parens patriae, we are empowered to intervene to protect children from both physical and emotional harm. In Re Commitment of N.N., 146 N.J. 112, 134, 679 A.2d 1174 (1996).
With these principles in mind, we turn our attention to the unique and perplexing issues presented by this appeal. This case pits the fundamental principles of a child's best interests against the right of a civil claimant to obtain compensation for his or her injuries from a tortfeasor. Even a cursory examination of this question reveals the profound public policy implications raised by either permitting or denying such a cause of action; either option would protect one legal principle at the expense of the other.
It is clear to us that the overarching force driving this civil action is not the best interests of the two children involved here. In this complaint for intentional infliction of emotional distress, plaintiff's goal is to obtain monetary damages and defendant's countervailing goal is to avoid liability. In such a contest, the children are merely the measure of damages.
That being said, we are not blind to scenarios in which one parent intentionally or recklessly imbues a child with such calumnious accounts of the other parent, so wicked in their intent and so destructive in their effect, that the situation necessitates civil redress. For example, a case in which one parent falsely and intentionally accuses the other parent of sexually abusing the child is so despicable on its face and so destructive in its effect on the innocent parent that it cries out for compensation which is not available in the Family Part or even in the criminal courts. The same can be said of cases involving parental abduction, where one parent, unlawfully and without the knowledge or consent of the other parent, removes the child to a foreign jurisdiction with the intent of frustrating any lawful means for returning the kidnapped child to the aggrieved parent. In such cases, sound public policy demands that the aggrieved parent and, by extension the innocent abducted child, be given compensation beyond just reunification.
However, sound public policy should not be driven by extreme scenarios or developed as an abstract academic exercise. We are not being asked to solve a law school riddle. Our decision here will have profound practical implications that will be played out in the real-life crucible of a courtroom. More importantly, before the parties even get before a judge, competent counsel will do their best to conduct probing and exhaustive discovery directed at the key witnesses in the case: the children.
We can plausibly envision such children being deposed about: (1) what mom or dad *1241 said; (2) when and how often mom or dad said it; (3) who else was present when they said it; and (4) how did the child feel when mom or dad said it. These depositions will surely be followed or preceded by psychological examinations of the child by experts selected by each side; teachers, counselors, schoolmates, extended family members, and other confidants will also be interrogated and called as witnesses.
In the midst of this litigation tug-of-war will be the children. After all, liability will be established only if plaintiff can show that the bond and affection that would have otherwise existed between him and the children has been severely compromised by defendant's outrageous and malicious acts. Thereafter, the measure of damages will depend upon the extent of the injury to that parent/child relationship. Here again, the children will be featured as the key witnesses.
In a Family Part proceeding involving custody or parenting time, where the governing principle is the best interests of the child, the judge proceeds from the well-established notion that under most circumstances a child is better off having a relationship with both parents. The family judge is thus responsible for shielding the child from the animosity that each parent may have against the other and promoting a spirit of selflessness where the parent subordinates his or her own personal grievances to the best interests of the child. As the Court noted in Sacharow v. Sacharow:
Indeed, by seeking a divorce and invoking the jurisdiction of the Family Part, each party assented to the possibility that there will be some curtailment of what would otherwise be the ordinary rights concomitant to parenthood. For example, a party may be denied custody. Visitation may be circumscribed. Vacations may be shared or lost. One parent may be granted the right to move away with the child. All such orders impair to some extent one of the parties' parental rights, and the party participants are deemed to have consented to the possibility of such impairment when they submit their disagreement to a court ... In such cases, the sole bench mark is the best interest of the child.
[177 N.J. 62, 80, 826 A.2d 710(2003) (internal citations omitted).]
Exactly the opposite is the case in a civil trial for alienation of a child's affection. In that contest, the child must take sides because he or she is the key witness against one parent. Extending the tort of intentional infliction of emotional distress to this context directly contravenes the principles embodied in the best interests of the child standard.
As noted in Fawzy, when the court is presented with a prima facie case of harm to a child, it is empowered to intervene and prevent such harm from coming to fruition. Fawzy, supra, 199 N.J. at 478-79, 973 A.2d 347. We are satisfied that plaintiff's cause of action, under the facts presented, constitutes a prima facie case of potential harm to the children named as parties thereto. Accepting plaintiff's factual allegations as true, and giving him all favorable inferences therefrom, plaintiff has not established a cause of action for intentional infliction of emotional distress.
As noted earlier, to make out a prima facie case of intentional infliction of emotional distress, plaintiff must show that: (1) defendant acted intentionally; (2) defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community;" (3) defendant's actions proximately caused *1242 him emotional distress; and (4) the emotional distress was "so severe that no reasonable [person] could be expected to endure it." Buckley, supra, 111 N.J. at 366, 544 A.2d 857.
We review plaintiff's allegations under the standards applicable to a motion brought pursuant to Rule 4:6-2(e). We are thus bound to search "the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989) (internal quotation and citation omitted).
Here, the gravamen of plaintiff's case rests on defendant's actions after she relocated to this State in 2006. According to plaintiff, defendant established a residence with the children in this State without his knowledge or consent, blocked all forms of communications between him and the children, and matriculated the children in a local school district under her surname. All this was intentionally done by defendant as a means of unlawfully depriving plaintiff of his parental rights to see and enjoy a relationship with his children. This period of isolation lasted for approximately three months. The facts recited, on their face, do not constitute a cause of action for intentional infliction of emotional distress as a matter of law.
As a matter of public policy, the grievances raised by plaintiff in this suit must be brought before and addressed by the Family Part as part of an action for custody or parenting time, where the governing principle for adjudication will be the best interests of these two children. In these matters, the Family Part has both the expertise and the power to correct abuses by one parent against the other, while shielding the children from the type of emotional injury that is inextricably linked to a civil action for damages.
However, we do not foreclose the possibility that a cause of action may be brought alleging facts that are "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," thus satisfying prong two of the Buckley standard. Buckley, supra, 111 N.J. at 366, 544 A.2d 857. As we previously noted, cases involving prolonged parental abduction, where children are intentionally removed to foreign jurisdictions for the purpose of frustrating the innocent parent's custodial rights, or intentional false accusations of parent/child sexual abuse, are but two examples of factual scenarios that may satisfy the outrageous conduct requirement under Buckley.
Because such claims raise issues that are uniquely suited to the function and expertise of the Family Part, they must be brought as part of an action seeking custody or parenting time under the Family Part's well-established ancillary jurisdiction as recognized by the Court in Tevis. That being said, it is imperative that this determination be made by the Family Part at the preliminary stages of the litigation process. In order to avoid entangling the children in the emotionally destructive process of discovery, a reviewing court must evaluate and determine the legal efficacy of this cause of action upon joinder of issue or in the context of a motion brought pursuant to Rule 4:6-2(e).[5]
*1243 We recognize that our role as an intermediate appellate court is to decide appeals that come before us by applying established principles of law, whether the source of that authority is by legislative enactments or through the evolution of our State's common law. As the ultimate arbiter on the development of our laws, we leave to our Supreme Court to extend or otherwise modify the principles we have outlined herein.

IV
As a final matter, we reverse the trial court's award of counsel fees to defendant as a sanction against plaintiff under the law against frivolous litigation. In deciding whether sanctions are appropriate, a court must determine whether the litigation before it is frivolous.
In order to find that a complaint, counterclaim, cross-claim or defense of the nonprevailing party was frivolous, the judge shall find on the basis of the pleadings, discovery, or the evidence presented that either:
(1) The complaint, counterclaim, cross-claim or defense was commenced, used or continued in bad faith, solely for the purpose of harassment, delay or malicious injury; or
(2) The nonprevailing party knew, or should have known, that the complaint, counterclaim, cross-claim or defense was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.
[N.J.S.A. 2A:15-59.1b.]
Because the statutory language is phrased disjunctively, a valid claim in law or equity, N.J.S.A. 2A:15-59.1b(2), could be frivolous if it were brought for the improper purposes cited, N.J.S.A. 2A:15-59.1b(1). Conversely, even without an improper purpose, N.J.S.A. 2A:15-59.1b(1), a claim could be frivolous if it utterly lacks a "reasonable basis in law or equity" and lacks a good-faith argument for extension of the law, N.J.S.A. 2A:15-59.1b(2).
In K.D. v. Bozarth, 313 N.J.Super. 561, 566, 575, 713 A.2d 546 (App.Div.), certif. denied, 156 N.J. 425, 719 A.2d 1023 (1998), we upheld the trial court's denial of frivolous litigation sanctions sought by defendants against a juvenile who filed a class action civil rights suit against a number of municipal officials in Pemberton Township. Despite the clear absence of liability by the named defendants, we affirmed the trial court's denial of counsel fees because the plaintiff had "good faith" in instituting the action. Id. at 574, 713 A.2d 546. The key to determining "good faith" is objective reasonableness. Iannone v. McHale, 245 N.J.Super. 17, 29, 583 A.2d 770 (App.Div.1990).
Plaintiff's arguments in support of his right to bring an action for intentional infliction of emotional distress on behalf of himself and his two minor children are objectively reasonable. As our analysis shows, plaintiff's complaint raised profound public policy questions. His legal position on these issues was not facially meritless. As Judge Pressler wisely cautioned in Iannone, "honest and creative advocacy should not be discouraged." Id. at 28, 583 A.2d 770.
In granting defendant's application for sanctions, the trial court focused on plaintiff's decision to file this cause of action in the Law Division, rather than in the Family Part where there was a pending matter *1244 concerning both custody and parenting time. The court thus emphasized that, even if plaintiff had a legitimate cause of action, because of "the circumstances, the history, everything that went on ... the conduct of [plaintiff] could not, as a matter of law ... constitute such a tort ... It is singularly inappropriate for this Court to be engaged in parallel litigation which still remains outstanding in the Family [Part]."
Plaintiff's counsel's decision to file this complaint in the Law Division, instead of including it as a Tevis claim in the Family Part, is not, in and of itself, the type of conduct that warrants sanctions under the frivolous litigation law. As this opinion illustrates, the law in this area was not settled. Under these circumstances, an attorney's tactical decision to pursue this tort claim in the Law Division does not rise to "bad faith, solely for the purpose of harassment, delay or malicious injury." N.J.S.A. 2A:15-59.1b(1).

V
We therefore affirm the trial court's order dismissing plaintiff's complaint for intentional infliction of emotional distress. We reverse the award of counsel fees in favor of defendant imposed as a sanction against plaintiff under the frivolous litigation law.
Affirmed in part, reversed in part.
NOTES
[1] We note, that plaintiff was not disinclined to file a legal action against defendant in areas not directly related to the children. During this same time period, plaintiff filed a defamation suit against defendant in the Law Division in Morris County. Although the record before us does not include the substance of that action, by order dated April 1, 2005, Judge Smith dismissed this suit "for lack of jurisdiction." On plaintiff's direct appeal, we affirmed the judgment of the trial court. Segal v. Lynch, Docket No. A-4501-04, 2006 WL 307799 (App.Div. Feb. 14, 2006), certif. denied, 186 N.J. 607, 897 A.2d 1061 (2006).
[2] Although the parties were never married, the Canadian court nonetheless characterized the award to defendant as "spousal support."
[3] See S.B. v. S.J.B., 258 N.J.Super. 151, 154, 609 A.2d 124 (Ch.Div. 1992).
[4] Although not binding on this court, other jurisdictions have similarly recognized the right of one spouse to assert a claim of intentional infliction of emotional distress against the other. See, e.g., Pugliese v. Superior Court, 146 Cal.App.4th 1444, 53 Cal.Rptr.3d 681, 684 (2d Dist.2007); Feltmeier v. Feltmeier, 207 Ill.2d 263, 278 Ill.Dec. 228, 798 N.E.2d 75, 82 (2003); Christians v. Christians, 637 N.W.2d 377, 382 (S.D.2001); Henriksen v. Cameron, 622 A.2d 1135, 1140 (Me. 1993); Twyman v. Twyman, 855 S.W.2d 619, 624 (Tex. 1993); Hakkila v. Hakkila, 112 N.M. 172, 812 P.2d 1320, 1322-25 (Ct.App.1991).
[5] In such cases where the facts pled permit the prosecution of an intentional infliction of emotional distress claim, the parent plaintiff cannot serve as the guardian ad litem for any child who is also named as a plaintiff in the action. The Family Part Judge must appoint a guardian ad litem who will represent the child in the action, independently evaluate the merits of the claims, and advise the child whether it is in his or her best interest to prosecute, dismiss, settle, or try the case to finality.