42 A.3d 227 (2012)
425 N.J. Super. 555
Edie Britman SAURO, Plaintiff-Respondent,
v.
Frank SAURO, Defendant-Respondent.
In the Matter of Budd Larner, P.C., Appellant.
Docket No. A-2735-09T3
Superior Court of New Jersey, Appellate Division.
Argued March 9, 2011.
Decided May 14, 2012.
*229 Thomas D. Baldwin, Short Hills, argued the cause for pro se appellant.
Edie Britman Sauro, respondent, argued the cause pro se.
Frank Sauro, respondent, argued the cause pro se.
Before Judges FUENTES, ASHRAFI and NUGENT.
The opinion of the court was delivered by
FUENTES, J.A.D.
The law firm of Budd Larner, P.C. (Budd Larner) was one of three firms that represented plaintiff Edie Britman Sauro during this protracted matrimonial case. Budd Larner now appeals the Family Part's equitable distribution award, arguing that the manner in which the court allocated the parties' marital assets negatively affected the firm's attorney charging lien pursuant to N.J.S.A. 2A:13-5. Specifically, Budd Larner challenges the court's decision to establish a $200,000 education trust fund to cover the cost of college education for the parties' three children; to release $12,000 to pay the cost of plaintiff's paralegal studies; and to issue two pendente lite orders that directed the payment of support to plaintiff and the children.
The tortured procedural history of this divorce action reveals how the emotional wrangling of the parties spiraled out of control, resulting in a remarkably expensive and legally unwieldy process that left this family financially devastated. Under these circumstances, the Family Part was forced to devote an inordinate amount of time and effort addressing a barrage of pretrial motions that enforced and, when necessary, modified pendente lite relief. The court also adjudicated plaintiff's application for leave to relocate and remove the children to another state; and ultimately determined the value and composition of the marital estate that would be subject to equitable distribution.
*230 The parties' penchant for aggressively litigating all of the issues arising from the dissolution of their marriage, combined with the high cost of legal representation, quickly led to a financial meltdown. All of the law firms involved, including Budd Larner, eventually sought and obtained leave from the court to withdraw as counsel of record. Each firm that withdrew from the case petitioned the court to impose an attorney charging lien in the amount of the outstanding fee the particular party owed at the time of withdrawal. In some cases, the lien attached to escrow accounts established by the court to fund pendente lite relief; other liens, including the one obtained by Budd Larner, would attach to the potential equitable distribution award the party would receive at the conclusion of the case.
When the case concluded, both sides were without legal representation. Invoking its parens patriae responsibility to protect the children of this dissolving union, the Family Part stepped into the breach and established "The Sauro Children College Trust Account" by allocating $200,000 that would have otherwise been subject to equitable distribution. The court also took other action in the course of the litigation to ensure that defendant honored his support obligation to plaintiff and the children, and set aside a relatively modest amount of funds to permit plaintiff to acquire skills to enter the labor force independent of defendant's support.
Mindful of our deferential standard of review, we affirm the Family Part's actions. These actions were well within its discretionary authority and in keeping with its obligation to take appropriate action to safeguard the interests of the children.

I
The parties married in 1986, and had three childrentwo boys and a girl. Although all of the children are now over the age of majority, the matrimonial action involved issues of custody and support because, at the time the complaint for divorce was filed in 2003, the children were minors and resided with plaintiff. When this case began, plaintiff was represented by the firm of Rylak & Gianos (the Rylak firm); defendant Frank Sauro was represented by Wilentz, Goldman & Spitzer, P.A. (the Wilentz firm).
On September 28, 2004, the court ordered unallocated pendente lite support, requiring defendant to pay plaintiff $9,000 per month in spousal and child support. This support obligation was amended by the court on December 22, 2004, directing defendant to pay the support obligation, including arrearages, through the probation department.
Shortly thereafter the parties entered into a consent order through which they agreed to "immediately take a mortgage or home equity loan from the equity in the marital home in the amount of $220,000." The order provided that "out of said $220,000, the sum of $100,000 shall be paid to [the Rylak firm] for counsel fees incurred by Plaintiff and the sum of $100,000 shall be paid to [the Wilentz firm] for counsel fees incurred by Defendant." A final handwritten provision directed the remaining $20,000 to be placed in an interest-bearing escrow account for the purpose of paying the home equity loan.
On February 1, 2005, the Wilentz firm sought leave to withdraw as defendant's counsel, and to permit defendant to proceed pro se. The court denied the application "as to the custody, parenting time and removal issues," but permitted the Wilentz firm to withdraw "as attorney of record on all economic issues not yet scheduled for trial."
*231 On March 14, 2005, the court granted the Rylak firm's motion to serve plaintiff with notice of a petition for an attorney lien in the amount of $100,000, in accordance with N.J.S.A. 2A:13-5, "so that a lien may be entered at the time of the final disposition and attach to the final judgment, and so that said judgment may include escrow of said funds in the event of fee arbitration." (Emphasis added.) The court granted similar relief to the Wilentz firm against defendant for an attorney lien in the amount of $130,000.[1]
On June 13, 2005, the court adjudged defendant in violation of litigant's rights for failing to pay the $9,000 monthly support obligation. By order dated July 28, 2005, the court fixed defendant's arrears at $34,000.
Although not directly disclosed in the record, we infer that sometime after July 28, 2005, the probation department received an infusion of funds payable to defendant. On September 2, 2005, the court ordered the probation department to pay plaintiff the support due for August 2005, and thereafter transfer the balance of these funds to plaintiff's counsel's trust account. The court directed plaintiff's counsel to set aside $100,000 to secure the payment of future support to plaintiff; $193,000 was to be set aside for the payment of taxes due on the "approximately $500,000 that was[] received from [defendant's real estate development partnership] Capital Realty & Development in July 2005"; and the balance was to be held in escrow pending further order of the court.
Plaintiff petitioned the court for leave to relocate to the State of Maryland with the three children. The custody and removal proceedings took place over eighteen days between December 2004 and August 2005. On September 23, 2005, the court granted plaintiff leave to relocate to Maryland with the two boys; the girl would continue to live in New Jersey with defendant. At the completion of this phase of the litigation, the court permitted the Wilentz firm to withdraw entirely as defendant's counsel. On December 20, 2005, the court granted the Wilentz firm a temporary charging lien against defendant.[2] Plaintiff filed for bankruptcy on September 14, 2005.
By order dated September 7, 2006, the court directed that $75,000 be released from the approximately $325,000 held in escrow by Mark Phillips, an attorney from the Rylak firm, to pay support due to plaintiff and the children and "to retain counsel and ... expert assistance." Starting October 1, 2006, the court directed Phillips to pay plaintiff the $9,000 monthly support award "until further order of the court or the depletion of the escrow." The court thereafter declared that the funds held in escrow for the support of plaintiff and the children had been depleted.

II
On September 11, 2006, plaintiff retained the Budd Larner firm to represent her in connection with the remaining economic issues associated with the divorce proceedings. On October 3, 2006, the court entered a case management order in which it: (1) directed Capital Realty to *232 distribute $170,000 directly to defendant; (2) discharged attorney Mark Phillips as escrow agent and appointed Drew Hurley[3] as the new escrow agent; (3) directed Capital Realty to turn over to Hurley a distribution due defendant in the approximate amount of $500,000; and (4) directed Hurley to "hold these funds in trust as security for the attorney liens of Mr. David Wildstein [an attorney with the Wilentz firm] and Mr. Mark Phillips, until further order of the Court."
On November 3, 2006, the court denied plaintiff's motion to release $100,000 from the Hurley escrow account, and denied plaintiff's request to set aside the Wilentz firm's attorney lien. In the same order, the court denied defendant's request to release $193,875 from the Hurley escrow, and to disqualify the Budd Larner firm from representing plaintiff in this case.
After conducting a hearing in response to a motion filed by the Wilentz firm, the court entered a "Judgment and Attorney Lien" on January 12, 2007, in favor of the Wilentz firm and against defendant, in the amount of $338,616.20. The judgment imposed a "charging lien against any award, decision or judgment that defendant shall receive in the pending divorce action." The court further directed that the "lien/judgment shall not be affected by any settlement between [plaintiff] and [defendant] pre or post divorce .... [but] shall not create a lien of judgment against any award, decision or judgment that [plaintiff] receives in the pending divorce action." On January 22, 2007, the court authorized Hurley to release $2,277.10 from the escrow account to pay himself for services rendered.
On June 29, 2007, after motions were filed by both parties for pendente lite relief, the court directed Hurley to pay defendant's income taxes as follows: for the year of 2004, $46,573 in federal taxes, and $8,392 in state taxes; for 2005, $113,176 in federal taxes, and $40,005 in state taxes; and for 2006, $7,212 in state taxes. The court denied numerous other relief sought by the parties, including a request that the court direct Hurley to pay college tuition and expenses for one of the boys, and $75,000 to pay plaintiff's attorney fees and litigation expenses.
In a memorandum of decision in support of its ruling, the court noted that it had previously "awarded the Wilentz firm judgment against Defendant in the amount of $338,616 ... [and] further determined the judgment to be also a charging lien." Plaintiff and defendant both opposed this action, arguing that the court did not have the authority to protect the Wilentz firm's lien by directing the escrow agent to hold the distribution of $338,616. The court summarized plaintiff's argument, presented by Budd Larner, as follows:
Plaintiff first argues that the Court erroneously determined the amount of the lien prior to the close of the instant litigation. Plaintiff argues that at the pendente lite stage, the Court cannot enforce the lien and exclude the Parties from using these funds for their support. Second, Plaintiff argues that the Court cannot attach the lien to these funds, as the Court has yet to determine which funds belong to which Party. Finally, Plaintiff argues that the Wilentz firm cannot have a lien because attorney liens attach only to the funds received by a Judgment (in this case a Judgment of Divorce). The Wilentz firm represented Defendant during the custody portion of *233 the trial. As such, Plaintiff argues there was no monetary "fruits" received from Wilentz's representation of Defendant.
In justifying its decision, the court distinguished between "enforcing the lien" and "protect[ing] the Wilentz lien." In the court's view, by directing the escrow agent to segregate and withhold the release of the funds, it was not enforcing the lien because it was not directing payment of the funds to the Wilentz firm, but was merely protecting its interest. With respect to the authority to impose a charging lien under N.J.S.A. 2A:13-5 before a final judgment, the court relied on the law of the case doctrine to hold that the propriety of the lien in favor of the Wilentz firm had been previously established and was not subject to challenge at that juncture.
On July 20, 2007, Budd Larner, on behalf of plaintiff, sought interlocutory review of the court's decision. Plaintiff argued to the appellate panel assigned to the motion that the trial court's order prevented the escrow agent from releasing funds to cover the parties' living expenses and litigation costs. On August 22, 2007, the appellate panel denied plaintiff's motion for leave to appeal. In the order denying leave to appeal, our colleagues included the following admonition to the trial court:
Leave to appeal is denied on the condition that the Family Part expeditiously consider the continued need for the restraints on the parties' access to the escrowed funds that are subject to the attorneys lien of the Wilentz law firm. Although we recognize that the Wilentz law firm has an unsatisfied final judgment against the husband and obtained a writ of execution in May 2007 to enforce that judgment, the record does not indicate whether the parties have adequately explored potential substitute collateral or other financial measures that might sufficiently protect the law firm's creditor interests without unduly impairing the parties' abilities to support themselves and their children.
The trial court heeded the appellate panel's admonition and authorized Hurley to release $75,000 to be allocated as follows: (1) $25,000 to pay college tuition and costs for one of the boys; and (2) the remaining $50,000 to be divided two-thirds to plaintiff and one-third to defendant. In a memorandum of opinion explaining his decision, the trial judge included the following comments:
The simple reality is that there is no money or asset other than the current escrow of $336,612.99, as of August 31, 2007 including interest. These parties have each spent very substantial sums for support, counsel fees, expert fees and other litigation costs. This legal battle has been raging for over four (4) years. Each of the parties received in excess of $200,000 from the escrow over the past year, and neither has any funds... for living expenses and they are without funds to pay for their son's [naming the child] college expenses.
This family is absolutely in cris[i]s, yet neither party demonstrates any indication of modifying their lifestyle or strategies in this lawsuit. Despite the desperate financial circumstances, Plaintiff is actually seeking to hire a "monitor" to oversee Defendant's business activities to be paid for form the escrow. It appears that these parties do not yet appreciate the extreme financial situation they are currently in.
....
Currently, there are no other assets other than the expectation of a payment by Capital Realty and the net proceeds of the marital residence which is being held by the Bankruptcy Trustee.
The Court does not perceive that the funds held by the Trustee in plaintiff's *234 bankruptcy are in any manner available to secure the Wilentz lien.
However, based on Defendant's representation that there is $75,000 due to him from Capital Realty, the Court will modify the provisions of the June 29, 2007 order
The Court will permit $75,000 to be released from the escrow, as follows: [whereupon the court describes the distribution previously noted.]
....
The parties are cautioned that absent distributions/payments from Capital Realty or other source in excess of $75,000 or further direction from the Appellate Division, this distribution shall be the final payment to each of them from the escrow, pending the trial in this matter.
The remaining balance in the escrow shall continue to be held by Mr. Hurley and shall be maintained as security for the Wilentz firm judgment, pending trial or further order of the court.
[ (Emphasis added).]
On July 11, 2008, the court granted Budd Larner's motion to be relieved as plaintiff's counsel of record, and imposed an attorney charging lien in favor of the firm, to be attached to plaintiff's equitable distribution award. The court directed Family Case Management
to schedule a plenary hearing ... on the issue of the attorney's charging lien entered against [plaintiff] not to exceed more than $122,664.97, together with interest accruing at the agreed upon rate set forth in the written attorney fee retainer agreement. This hearing shall also address the issue of whether the firm of Rylak & Gianos has an attorney lien and if so for how much and whether the proceeds of equitable distribution will be allocated among counsel on a pro rata basis in accordance with Martin v. Martin, 335 N.J.Super. 212 [762 A.2d 246] (App.Div.2000).[4]
The court also established a discovery schedule between plaintiff and Budd Larner, and authorized both sides to propound interrogatories and notices to produce. Thus, in addition to this highly contentious divorce case, which remained ongoing with no reasonable end in sight,[5] plaintiff was now fully engulfed in a parallel adversarial matter involving the lawyers she had retained during the litigation.
On September 4, 2008, the court entered an order regarding the disposition of several issues relating to the escrow funds. Among the relief granted in this order, the court: (1) nullified and voided a writ of execution filed by the Wilentz firm on $75,000 distributed by Capital Realty to defendant and held in escrow by Hurley; (2) granted defendant's request to vacate the Alias Writ of Execution on the Copeland [6] escrow account; and (3) denied defendant's *235 request to restrain the Wilentz firm from "applying for any additional writs of execution" or otherwise enforcing its lien because, as the court reasoned, the firm had an enforceable judgment and charging lien against defendant. The court granted, however, defendant's request to exempt from execution all funds held in the Copeland and Hurley escrow accounts until the entry of final judgment.
The remaining funds in the Hurley escrow account continued to be held "as security for the Wilentz [firm's] lien or as the court may otherwise direct." Finally, the court restrained further distributions from the Hurley escrow account "for the parties' use or their support, except by consent order or motion if agreement is not reached." The court supported its decisions through a comprehensive, detailed statement of reasons, addressing each of the specific requests made and the arguments raised in support of or in opposition to the relief requested.

III
On January 5, 2009, the court granted Budd Larner's motion for summary judgment on the parallel fee collection case against plaintiff, and imposed an attorney lien against plaintiff in the amount of $122,664.97 plus interest. To "protect [Budd Larner's] rights," the court restrained and ordered plaintiff "not to diminish or dispose of assets to diminish her Anticipated Entitlement." The court amended this order on January 9, 2009, by entering judgment against plaintiff in the amount of $122,664.97 plus pre-judgment interest "at the [then] current legal rate of 5.5%."
On September 17, 2009, the court ordered Copeland to release $46,177.52 from the escrow account to the Hunterdon County Probation Office to offset defendant's child support arrears. In its statement of reasons in support of this ruling, the court noted that the child support obligation was established by order entered before the attorney's lien. As such, child support had priority over and was superior to Budd Larner's lien, pursuant to N.J.S.A. 2A:17-56.23b(a). As a corollary to this finding, the court authorized the release of funds held in the Copeland escrow account to provide "partial satisfaction for the outstanding child support obligation...."
The court held a plenary hearing on October 2, 2009, concerning the attorney liens and college education costs of the parties' children. By this time, plaintiff was being represented by Robert Greenbaum. Budd Larner argued that its attorney charging lien applied not just to equitable distribution, but to other monies held in escrow for child support. The Wilentz firm joined in Budd Larner's argument. Through informal comments made by Mr. Greenbaum on plaintiff's behalf, and by defendant, appearing pro se, the parties provided information to the court on the cost of the children's education.
After considering the views expressed, the court informed those involved that it was "of the opinion that ... charging liens of the attorneys would only attach to the monies that were equitable distribution." In the event the fund earmarked in the escrow account for education costs is not depleted, the balance would become equitable distribution and subject to attachment by the attorney charging liens. Given the significance of this ruling, the *236 court allowed the parties to submit supplemental briefing to address: (1) whether the court had the right to create a trust for the children's education costs; (2) whether the attorney liens attach to that trust; and (3) the priority of the attorney liens.
One week later, the court held a plenary hearing to determine the scope and enforceability of Budd Larner's attorney lien. Both of the parties appeared pro se;[7] Budd Larner was represented by attorney Thomas Baldwin. In a rare concurrence in what otherwise had been a highly contentious divorce, the parties jointly argued that their children's support, in the form of educational expenses, should not be subordinated to Budd Larner's attorney's lien.
As part of the colloquy with Budd Larner's attorney, the court noted that it created a $200,000 education fund to avoid "irreparable harm" to the children. In the court's view, "these three children ... had no part of the fight.... [T]hey're just kids... and they should go to college.... [T]here is no way you can send three kids, all three kids four years to college on $200,000. It's not going to work." By letter dated November 9, 2009, plaintiff requested the court to authorize an "emergent" tuition payment out of the Hurley escrow account to cover college expenses for one of her sons.
The court entered a final Judgment of Divorce on December 23, 2009, and an "Amended Judgment of Divorce" on January 19, 2010. The court characterized as marital assets monies held in the Hurley escrow account, defendant's 16.66% interest in a parcel of land, and defendant's potential lawsuit against Capital Realty for monies allegedly owed to him. As of July 2009, $370,394.04 was held in trust in the Hurley and Copeland escrow accounts.
The court found that the Copeland fund had been fully distributed, leaving only the Hurley account with a remaining balance of $324,812.99. From these funds, the court ordered "that the sum of $48,449.80... be designated as equitable distribution to the plaintiff. This money is subject to the attorney liens." The court directed that Budd Larner be paid 81.82%, or $39,641.63 from plaintiff's equitable distribution award of $48,449.80. Budd Larner retained a charging lien against plaintiff for $122,664.97, as reflected in the order entered by the court on July 11, 2008. All the liens would be distributed pro rata out of the equitable distribution awarded to each party.

IV
On appeal, Budd Larner[8] challenges four provisions in the Amended Judgment of Divorce: (1) $46,177.52 paid to the Hunterdon County Probation Office from the Copeland account, considered by the court as spousal and child support arrears; (2) $14,339.28 paid to plaintiff from the Hurley trust account that the court found was defendant's total pendente lite arrears as of December 31, 2009; (3) $200,000 from the Hurley account and designated by the court as the Sauro Children College Trust Account; and (4) $12,000 paid to plaintiff *237 from the Hurley account to cover her tuition for paralegal school.
Budd Larner argues that, in a misguided attempt to protect the parties' children from the financial consequences of their parents' decision to aggressively litigate almost every aspect of this matrimonial case, the court improperly reduced the equitable distribution award plaintiff was otherwise entitled to receive. According to Budd Larner, the court improperly diminished the value of the asset to which its attorney charging lien attached upon final judgment, pursuant to N.J.S.A. 2A:13-5. Plaintiff and defendant, appearing before us pro se, argue that the evidence supports the establishment of an education trust from the monies held in the Hurley escrow account. They both maintain that limiting Budd Larner's lien, by permitting it to attach only to the equitable distribution plaintiff actually received in the divorce decree, was proper and lawful.

V
We conclude that the trial judge's decision to establish an education trust fund to cover the children's cost of attending college was properly supported by the record, well within the court's authority, and in keeping with the court's obligation to act in the best interest of the children. Budd Larner's contractual rights, as reflected in the retainer agreement with plaintiff, do not abrogate or limit the Family Part's overriding obligation to act in the best interest of the children in this case.
In a pending matrimonial action, the Family Part judge has the statutory authority to enter orders providing for the "care, custody, education and maintenance of the children," and to ensure that funds will be available to cover the costs for these concerns. N.J.S.A. 2A:34-23. The court's power in this respect includes, but it is not limited to, "the creation of trusts or other security devices, to assure payment of reasonably foreseeable medical and educational expenses." Ibid.
The court also has broad discretionary authority to equitably distribute marital property. In going about this task, the court must decide what specific property each spouse is eligible to receive by way of distribution; the value of such property for purposes of distribution; and how such allocation can most equitably be made after analysis of the factors set forth in N.J.S.A. 2A:34-23.1. See Rothman v. Rothman, 65 N.J. 219, 232, 320 A.2d 496 (1974); see also N.J.S.A. 2A:34-23(h).
Our review of the Family Part's order pertaining to the division of marital assets is narrow. Valentino v. Valentino, 309 N.J.Super. 334, 339, 707 A.2d 168 (App.Div.1998) (citing Wadlow v. Wadlow, 200 N.J.Super. 372, 377, 491 A.2d 757 (App.Div.1985)). We must determine "whether the trial court mistakenly exercised its broad authority to divide the parties' property or whether the result reached was bottomed on a misconception of law or findings of fact that are contrary to the evidence." Genovese v. Genovese, 392 N.J.Super. 215, 223, 920 A.2d 660 (App.Div.2007).
Here, the creation of the education trust fund for the children reflected the trial judge's well-supported concern that "due to the parties' dire present financial condition" the children's educational future needed special protection. See Jacobitti v. Jacobitti, 135 N.J. 571, 580, 641 A.2d 535 (1994) (recognizing that Family Part judges have the authority to create trusts to secure an obligor's future support payments).
The establishment of the education trust fund is also supported by and consistent with the Family Part's parens patriae obligation "to intervene where it is necessary *238 to prevent harm...." Segal v. Lynch, 413 N.J.Super. 171, 181, 993 A.2d 1229 (App. Div.) (citing Fawzy v. Fawzy, 199 N.J. 456, 474-75, 973 A.2d 347 (2009)), certif. denied, 203 N.J. 96, 999 A.2d 464 (2010).
The parens patriae doctrine authorizes the Family Part to modify freely negotiated arbitration clauses concerning child custody and parenting time, by imposing judicial oversight to prevent an adverse impact or harm to the child, Fawzy, supra, 199 N.J. at 477-78, 973 A.2d 347, and to restrict common law causes of actions, Segal, supra, 413 N.J.Super. at 192, 993 A.2d 1229. Here, the court placed higher priority upon the children's educational well-being over the right of counsel to enforce an attorney charging lien.
An attorney's right to recover counsel fees under N.J.S.A. 2A:13-5 is unrelated to the principles governing the Family Part's authority to act in the best interests of the minors subject to the court's jurisdiction. This is so because the statutory lien is only an inchoate right, vesting only after a final judgment has been entered, and its enforcement subject to equitable considerations.
The New Jersey Attorney's Lien Act states:
After the filing of a complaint or thirdparty complaint or the service of a pleading containing a counterclaim or cross-claim, the attorney or counselor at law, who shall appear in the cause for the party instituting the action or maintaining the third-party claim or counterclaim or cross-claim, shall have a lien for compensation, upon his client's action, cause of action, claim or counterclaim or cross-claim, which shall contain and attach to a verdict, report, decision, award, judgment or final order in his client's favor, and the proceeds thereof in whose hands they may come. The lien shall not be affected by any settlement between the parties before or after judgment or final order, nor by the entry of satisfaction or cancellation of a judgment on the record. The court in which the action or other proceeding is pending, upon the petition of the attorney or counsellor at law, may determine and enforce the lien.
[N.J.S.A. 2A:13-5 (emphasis added).]
To protect the client, the lien must be instituted according to the procedure set forth in H & H Ranch Homes, Inc. v. Smith, 54 N.J.Super. 347, 353, 148 A.2d 837 (1959). Like all procedural rights, the client is free to waive some or all of the protections provided by the Court in H & H Ranch Homes. As we noted in Martin v. Martin, 335 N.J.Super. 212, 224-25, 762 A.2d 246 (App.Div.2000), "a situation might occur when a client does not contest the fees charged by the respective attorneys who provided representation and acknowledges that the viable assets awarded in the judgment are insufficient to meet the total obligation."
As with all equitable remedies, the lien is not mechanically imposed upon a mere showing of procedural compliance. "The lien is rooted in equitable considerations, and its enforcement is within the equitable jurisdiction of the courts." Id. at 222, 762 A.2d 246. The lien is "intended to protect attorneys who do not have actual possession of assets against clients who may not pay for services rendered." Ibid. (citations omitted); see also Musikoff v. Jay Parrino's The Mint, L.L.C., 172 N.J. 133, 142, 146, 796 A.2d 866 (2002); In re Estate of Balgar, 399 N.J.Super. 426, 442, 944 A.2d 734 (Law Div.2007); Levine v. Levine, 381 N.J.Super. 1, 9, 884 A.2d 222 (App.Div.2005). "Retention of assets is not a feature of [the N.J.S.A. 2A:13-5] lien, nor is the existence of a specific and isolated fund essential to its vitality." *239 James v. Harris, 42 N.J.Super. 468, 471, 127 A.2d 215 (Law Div.1956).
As an inchoate right, the lien "is merely a right in the attorney to a lien on any judgment recovered for the attorney's client." Cole, Schotz, Bernstein, Meisel & Forman, P.A. v. Owens, 292 N.J.Super. 453, 460, 679 A.2d 155 (App. Div.1996). Here, Budd Larner is "an equitable assignee of the judgment to the extent of [her] debt." Ibid. Because plaintiff did not recover the funds at issue, there is nothing for Budd Larner to recover. Morrone v. Thuring, 334 N.J.Super. 456, 466, 759 A.2d 1238 (Law Div.2000).
An attorney's charging lien against his former client attaches to the final judgment. As we explained in Martin:
Under the statute, the lien attaches to the judgment, decision, award, etc., in gross, not to specific assets. If it becomes necessary to allocate assets between or among attorneys who have otherwise established entitlement to a charging lien, then this must be done as equitably as possible. In our view, no attorney in this circumstance is entitled to a priority. Each stands on equal footing. We believe a pro rata distribution is appropriate. Thus, if one attorney's bill represents twenty-five percent of all the attorney fees properly due, owing and unpaid, then that attorney is entitled to a charging lien on twenty-five percent of the viable assets in the judgment awarded the client. The trial judge must scrupulously evaluate the nature of each asset in the judgment. A promissory note that may not be paid cannot be placed in the same category as a fund in existence. ... While much of this will never be an exact science, nevertheless, a court must make every effort to treat the claiming attorneys evenhandedly so that none is preferred over the others.
[Martin, supra, 335 N.J.Super. at 225-26, 762 A.2d 246.]
Budd Larner's remaining arguments attacking the court's exercise of its discretionary authority lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). In making equitable distribution of property, the Family Part must consider the factors outlined in N.J.S.A. 2A:34-23.1. None of the factors listed in the statute obligate or even authorize the court to consider an attorney charging lien in determining an equitable distribution award. Equally fallacious is the notion that an attorney's right to enforce a retainer agreement entered into with a party in a matrimonial action is a proper factor for the court to consider in exercising its discretionary authority in matters affecting the welfare of the children.
The Family Part's jurisdiction over this matter must be guided exclusively by the best interest of the children. The court's power must be used to moderate the financial disruption caused by the dissolution of the marital estate, and to the extent possible, restore and promote the stability necessary for the parties to make sound parenting decisions. The court is also obligated to protect the children of the dissolving union, who, at times, become embroiled in their parents' antagonism, and fall prey to their misguided passions.
When the adults in the controversy are unable or unwilling to act in the best interests of their own children, the court must be free to act, swiftly, decisively, and unfettered by extraneous considerations. The establishment of a judicially crafted educational trust fund is but one of a myriad of creative remedies in the court's equitable arsenal. An attorney charging *240 lien, or any other of the possible numerous claims that can be asserted against a family's limited financial resources, cannot undermine the court's parens patriae responsibility. The monies supporting the education trust are restricted to cover the cost of the children's college education, and would thus not be available to plaintiff at the time of final disposition.
The court also took appropriate action to provide plaintiff with the opportunity to obtain marketable skills after the dissolution of the marriage. Contrary to Budd Larner's position, the court's actions here are not inconsistent with the protections afforded to attorneys in N.J.S.A. 2A:13-5. The lien created by this statute attaches only to funds available to the parties at the time of the final disposition of the case. Although the $12,000 allocated by the court to fund plaintiff's paralegal studies and the unallocated pendente lite support may have inured to plaintiff's benefit, they were not "available" to plaintiff at the time of final disposition.
Affirmed.
NOTES
[1] As was the case with the bulk of all orders entered in this case, this order was prepared by the court. In it, the court noted that defendant appeared pro se in opposition to the relief granted to the Wilentz firm. There is no indication that plaintiff opposed the relief granted to the Rylak firm.
[2] Although the December 20, 2005 order is not included in the record, it is mentioned in the Judgment and Attorney Lien dated January 12, 2007, in favor of the Wilentz firm.
[3] The court fixed Hurley's compensation at $325 per hour, and reserved for trial allocation between the parties of Hurley's total fees.
[4] In the interest of completeness, we note that the court also granted defendant's application to reduce his child support obligation to $4,000 per month; and addressed and disposed of a series of requests made by defendant for the release of funds from the escrow account, including denying defendant's request for the release of funds held to protect the lien in favor of the Wilentz firm.
[5] In the memorandum of opinion addressing Budd Larner's motion to be relieved as plaintiff's counsel, the court cited a certification submitted by Susan Reach Winters, an attorney in the firm. According to the court, Ms. Winters averred that her firm had billed plaintiff $173,327.97 for services rendered through March 12, 2008. Plaintiff had only paid $50,000, leaving a balance of $123,327.97. Despite incurring over $173,000 in fees by plaintiff alone, the case was not listed for review before the early settlement panel, and no trial date had been set.
[6] Pamela M. Copeland was an attorney with the firm of Copeland, Schimalla & Wechsler, who, at one point had represented defendant. The court appointed Copeland as escrow agent for defendant by order dated July 11, 2008.
[7] On this day, the court relieved Greenbaum as counsel for plaintiff and fixed Greenbaum's charging lien against plaintiff in the amount of $27,250. The order granting this relief stated that Greenbaum's lien "shall attach to any proceeds that are paid as equitable distribution by any settlement, verdict and/or decision of this court." Also on this day the court fixed an attorney's charging lien against defendant and in favor of Copeland for $24,927.95, to be paid out of the proceeds that are equitably distributed or otherwise paid to defendant.
[8] The Wilentz, Greenbaum, and Copeland firms are not participants in this appeal.