NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0387-11T1

PETER INNES and VICTORIA
SOLENNE INNES, by Her
Guardian PETER INNES,

    Plaintiffs-Respondents,

v.

MADELINE MARZANO-LESNEVICH,
ESQ., and LESNEVICH &
MARZANO-LESNEVICH, Attorneys
At Law, i/j/s/a,

    Defendants-Appellants/
    Third-Party Plaintiffs,

v.

MITCHELL A. LIEBOWITZ, ESQ.,
PETER VAN AULEN, ESQ. and
MARIA JOSE CARRASCOSA,

    Third-Party Defendants.

| APPROVED FOR PUBLICATION |
| :---: |
| **April 7, 2014** |
| **APPELLATE DIVISION** |

_____

Argued October 8, 2013 — Decided April 7, 2014

Before Judges Messano, Hayden and Rothstadt.

On appeal from the Superior Court of New
Jersey, Law Division, Bergen County, Docket
No. L-7739-07.

Christopher J. Carey argued the cause for
appellant Madeline Marzano-Lesnevich, Esq.
(Graham Curtin, P.A., and Lesnevich &
Marzano-Lesnevich, LLC, attorneys; Michael
R. Mildner, on the brief).

James H. Waller argued the cause for respondents Peter and Victoria Innes (Mr. Waller, attorney; Mr. Waller and Michael A. Casale, on the brief).

Steven J. Tegrar argued the cause for respondent Peter Van Aulen (Law Offices of Joseph Carolan, attorneys; Mr. Tegrar and George H. Sly, Jr., on the brief).

William F. O'Connor, Jr., argued the cause for respondent Mitchell A. Liebowitz, Esq. (McElroy, Deutsch, Mulvaney & Carpenter, L.L.P., attorneys; Mr. O'Connor, of counsel; Lawrence S. Cutalo, on the brief).

Respondent Maria A. Carrascosa has not filed a brief.

The opinion of the court was delivered by

MESSANO, P.J.A.D.

Plaintiff Peter Innes, individually and on behalf of his daughter, Victoria Solenne Innes (Victoria, and collectively plaintiffs), filed suit against defendants Madeline Marzano-Lesnevich, an attorney, and her law firm, Lesnevich & Marzano-Lesnevich (the Lesnevich firm, and collectively defendants).[1] The complaint stemmed from defendants' allegedly improper release of Victoria's United States passport to her mother, Maria Jose Carrascosa, during the prelude to contentious

---

[1] Separate counsel represented Innes and his daughter in the Law Division and on appeal, although plaintiffs filed a joint brief.

matrimonial proceedings between Innes and Carrascosa.[2] Innes alleged that Carrascosa used the passport in 2005 to "abduct" Victoria and bring her to Spain, where the child remains with her maternal grandparents, beyond the reach of her father.

Defendants filed an answer and third-party complaint seeking contribution against (1) Carrascosa, their former client; (2) Peter Van Aulen, the attorney for Innes in the matrimonial dispute; and (3) Mitchell Liebowitz, the attorney who initially represented Carrascosa. Before trial, Van Aulen and Liebowitz were granted summary judgment, while defendants' motions seeking summary judgment dismissing the complaint were denied. The court also sua sponte severed defendants' third-party complaint against Carrascosa.

Immediately before trial, defendants moved to exclude any claim for counsel fees, and to bar the testimony of plaintiffs'

---

[2] The parties' divorce and related actions have resulted in several previous decisions in our courts, the federal courts and the courts of Spain. In our prior decision, we presented a comprehensive overview and held that New Jersey had subject matter jurisdiction over the parties' divorce, property distribution and child custody issues. Innes v. Carrascosa, 391 N.J. Super. 453, 462 (App. Div.), certif. denied, 192 N.J. 73 (2007), cert. denied, 555 U.S. 1129, 129 S. Ct. 981, 173 L. Ed. 2d 167 (2009). See also Carrascosa v. McGuire, 520 F.3d 249, 263 (3d Cir.) (affirming district court's determination that New Jersey Superior Court had authority to rule on the child's custody and to issue orders pertaining to the mother's civil contempt and incarceration), cert. denied, 555 U.S. 998, 129 S. Ct. 491, 172 L. Ed. 2d 363 (2008).

professional expert, attorney George Conk. The judge denied both requests. The judge reserved decision on defendants' motion to bar plaintiffs' claims for emotional distress damages.

At the close of plaintiffs' case, defendants moved to dismiss the complaint for failure to establish proximate cause, and to dismiss plaintiffs' claims for emotional distress damages. The judge denied both requests.

The jury returned a verdict in favor of plaintiffs and awarded damages of $700,000 to Innes and $250,000 to Victoria. On May 20, 2011, judgment was entered that also included pre-judgment interest of $133,815.07 for Innes and $47,791.09 for Victoria. On June 28, 2011, the judge entered an amended order for judgment that additionally included counsel fees and costs for Innes and Victoria in the amounts of $158,517.70 and $126,397.07, respectively.

Defendants moved for a new trial or for judgment notwithstanding the verdict (JNOV), which the judge denied after initially reserving decision. The judge granted a stay of judgment pending disposition of the third-party complaint against Carrascosa.

On July 18, 2011, plaintiffs filed a motion seeking to participate in the trial of defendants' third-party complaint against Carrascosa and to "bar[] the allocation of fault at

. . . trial." In a written opinion, the judge dismissed defendants' third-party complaint with prejudice, concluding essentially that defendants were not entitled to contribution from Carrascosa. This appeal followed.

Defendants raise myriad arguments regarding the interlocutory orders denying their pre-trial motion for summary judgment seeking dismissal of the complaint, as well as the orders granting Van Aulen and Liebowitz summary judgment. As to the trial itself, defendants contend the judge erred by permitting Conk to testify, allowing the jury to award emotional distress damages without any medical testimony and amending his charge to the jury after defendants' summation. Defendants also argue their motions for judgment and JNOV should have been granted.

Defendants also contend their third-party claim against Carrascosa should not have been severed from the trial, and the judge erred by ultimately dismissing the complaint. Lastly, defendants contest the award of any counsel fees.

We have considered these arguments in light of the record and applicable legal standards. We affirm in part, reverse in part, and remand for entry of an amended judgment.[3]

---

[3] Plaintiffs argue that the appeal should be dismissed as untimely, having not been filed within forty-five days of the
(continued)

We first consider defendants' arguments regarding the pre-trial orders granting Van Aulen and Liebowitz summary judgment. We need not set forth the entire factual history between Innes and Carrascosa, which was detailed in our prior opinion, see Innes, supra, 391 N.J. Super. at 461-65, and we limit our consideration as necessary to the motion record that existed when the orders were entered. See, e.g., Ji v. Palmer, 333 N.J. Super. 451, 463-64 (App. Div. 2000) ("In reviewing a summary judgment, we can consider the case only as it had been unfolded to that point and the evidential material submitted on that motion.") (citations omitted).

In October 2004, Innes and Carrascosa were separated but neither had filed a divorce complaint. Innes was represented by Van Aulen, and Carrascosa was represented by Liebowitz. Victoria was four and one-half years old and resided with

_____

(continued)
July 18, 2011 amended judgment. R. 2:4-1(a). However, it was not until September 2, 2011, that the court dismissed the third-party complaint with prejudice, adopting the argument that plaintiffs made in their motion to intervene. Defendants' notice of appeal was timely filed thereafter. Plaintiffs' argument lacks sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

A-0387-11T1

Carrascosa after the separation. It suffices to say that the instant litigation centered on the October 2004 agreement (the Agreement) executed by Innes and Carrascosa as it related to restrictions upon travel with Victoria. Innes, supra, 391 N.J. Super. at 462. Specifically, the Agreement, drafted by Liebowitz on his letterhead, provided in relevant part:

> Neither . . . Carrascosa nor . . . Innes may travel outside of the United States with Victoria . . . without the written permission of the other party. To that end, Victoria['s] . . . United States and Spanish passport [sic] shall be held in trust by Mitchell A. Liebowitz, Esq. Victoria['s] . . . Spanish passport has been lost and not replaced, and its loss was reported to the Spanish Consulate in New York. . . . Carascosa [sic] will file an application for a replacement Spanish passport within [twenty] days of today.

On November 23, 2004, Liebowitz responded to a letter written by Sarah J. Jacobs, an associate with the Lesnevich firm, advising that Carrascosa had retained them and seeking release of the file.[4] Liebowitz wrote: "As you may know, I am holding her daughter's United States Passport. I would prefer if you arranged for the original file to be picked up by messenger with the messenger acknowledging receipt of the passport." On November 24, Jacobs wrote to Van Aulen,

_____

[4] Jacobs' prior surname was "Tremml." The documentary evidence at trial bore that name.

indicating the Lesnevich firm's representation of Carrascosa and noting that, despite having signed the Agreement, Carrascosa "ha[d] grave concerns" regarding provisions dealing with Innes' parenting time. Notes taken by Jacobs during an office conference with Carrascosa on November 18, 2004, were filed in support of both Van Aulen's and Liebowitz's summary judgment motions. The notes contained the following: "Spanish passport stole[n.] American passport turned over to attorney[.] GET BACK[.]"

In her deposition, Marzano-Lesnevich stated she received the file from Liebowitz and reviewed the Agreement sometime in December. Victoria's United States passport was in the file at the time, but it was missing after a December meeting with Carrascosa. The implication was that Carrascosa had taken the passport without Marzano-Lesnevich's foreknowledge.

It was first revealed that Victoria was in Spain during proceedings before the Family Part in February 2005. In a February 2006 letter to plaintiffs' attorney in this litigation, Marzano-Lesnevich claimed Liebowitz never advised her of "a requirement to hold [the passport] in trust." She also wrote: "At the time we turned over the passport to the mother, the [A]greement between the parties was moot[,]" because "it had been repudiated by both parties immediately." (Emphasis added).

On this motion record, in December 2009, the judge granted Van Aulen summary judgment and dismissed the third-party claim against him. Defendants moved for reconsideration in August 2010 after securing the expert report of attorney John F. DeBartolo. In November 2010, the judge denied the motion for reconsideration. In his written opinion, the judge explained: "Based on the facts herein, Van Aulen cannot be classified as a joint tortfeasor because he did not breach his duty to Innes and did not have a duty to anticipate that [defendants] would violate a fiduciary obligation."

Liebowitz sought summary judgment in August 2010. In support, he attached defendants' answers to interrogatories in which they claimed that Carrascosa "took her daughter's passport. No one [at the firm] 'gave it' to her or 'turned it over to her.'" They also denied knowing that Carrascosa intended to "remove Victoria . . . from the jurisdiction o[f] New Jersey."

By the time Liebowitz's motion was filed, Jacobs had been deposed. She testified that Marzano-Lesnevich told her that she (Marzano-Lesnevich) gave Victoria's passport to Carrascosa. Carrascosa had also been deposed and testified that she always had Victoria's Spanish passport and it was never lost or stolen. Carrascosa asked the Lesnevich firm for Victoria's United States

A-0387-11T1

passport and picked it up the day before her daughter travelled to Spain with her grandparents.[5] Carrascosa also stated that she told the firm "we were going to travel."

In November 2010, the judge granted summary judgment to Liebowitz. In his written opinion, the judge concluded that after Carrascosa discharged him, Liebowitz could not have reasonably anticipated that Innes would continue to rely on his (Liebowitz's) actions or representations. Liebowitz did not owe a duty of care to Innes after transferring his file containing the passport to the Lesnevich firm.

Defendants argue the judge erred by denying their motion for reconsideration of the prior summary judgment granted to Van Aulen and by granting Liebowitz summary judgment.[6] "In an appeal of an order granting summary judgment, appellate courts 'employ

---

[5] Later testimony revealed that Victoria did not leave the United States until January 13, 2005, nearly a month after Carrascosa secured possession of the passport.

[6] Defendants' notice of appeal did not list the November 2010 order denying reconsideration. See R. 2:5-1(f)(3)(A) (requiring the notice of appeal to include all orders for which review is sought). Nevertheless, in the interests of justice, we consider all issues raised regarding the dismissal of the third-party complaint against Van Aulen. See Fusco v. Bd. of Educ., 349 N.J. Super. 455, 461 (App. Div.) (recognizing that in some situations, "the basis for the motion judge's ruling on the summary judgment and reconsideration motions may be the same. In such cases, an appeal solely from the grant of summary judgment or from the denial of reconsideration may be sufficient for an appellate review of the merits of the case[.]"), certif. denied, 174 N.J. 544 (2002).

the same standard [of review] that governs the trial court.'" Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010) (alteration in original) (quoting Busciglio v. DellaFave, 366 N.J. Super. 135, 139 (App. Div. 2004)). We first determine whether the moving party has demonstrated there were no genuine disputes as to material facts. Atl. Mut. Ins. Co. v. Hillside Bottling Co., Inc., 387 N.J. Super. 224, 230 (App. Div.), certif. denied, 189 N.J. 104 (2006).

> [A] determination whether there exists a "genuine issue" of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.
>
> [Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).]

We then decide "whether the motion judge's application of the law was correct." Atl. Mut. Ins. Co., supra, 387 N.J. Super. at 231. We conduct our review de novo. Gere v. Louis, 209 N.J. 486, 499 (2012).

Defendants were entitled to contribution from Van Aulen or Liebowitz only if either respectively was a joint tortfeasor, pursuant to the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -5 (JTCL). Under the JTCL, "'joint tortfeasors'

means two or more persons jointly or severally liable in tort for the same injury." N.J.S.A. 2A:53A-1. "'It is common liability at the time of the accrual of plaintiff's cause of action which is the Sine qua non of defendant's contribution right.'" Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 72 (2004) (quoting Markey v. Skog, 129 N.J. Super. 192, 200 (Law Div. 1974)). Since plaintiffs never asserted any claim against either Van Aulen or Liebowitz, the inquiry is whether defendants presented a prima facie case that either was liable to plaintiffs.

"The elements of a cause of action for legal malpractice are (1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff." McGrogan v. Till, 167 N.J. 414, 425 (2001) (citing Conklin v. Hannoch Weisman, 145 N.J. 395, 416 (1996)).

Defendants failed to present a prima facie case that Van Aulen committed legal malpractice in his representation of Innes. When Van Aulen first moved for summary judgment, defendants produced no expert report supporting the elements of professional negligence. See e.g., Buchanan v. Leonard, 428 N.J. Super. 277, 288-289 (App. Div. 2012) ("As 'the duties a

lawyer owes to his client are not known by the average juror,' expert testimony must necessarily set forth that duty and explain the breach.") (quoting Carbis Sales, Inc. v. Eisenberg, 397 N.J. Super. 64, 78 (App. Div. 2007)).

When defendants sought reconsideration, they furnished DeBartolo's report. While the report proposed some "straightforward and prudent steps" Van Aulen might have taken, it did not state that he breached any professional standards or that proximately-caused damages resulted. Indeed, DeBartolo opined that, because Carriscosa was solely responsible for removing Victoria from the United States, defendants themselves were not a proximate cause of plaintiffs' damages.

The record also fails to support a claim that Liebowitz, who was not Innes's attorney, could be liable for breaching a duty owed to a non-client. Although our courts are generally reluctant to permit a non-client to sue an adversary's attorney, LoBiondo v. Schwartz, 199 N.J. 62, 100 (2009), in limited circumstances, "attorneys may owe a duty of care to non-clients when the attorneys know, or should know, that non-clients will rely on the attorneys' representations and the non-clients are not too remote from the attorneys to be entitled to protection." Petrillo v. Bachenberg, 139 N.J. 472, 483-84 (1995).

"[T]he rule announced in Petrillo has been applied rather sparingly, . . . [but] [i]t is not . . . the only basis on which [the Court] ha[s] recognized the potential for a direct claim against an attorney by a nonclient." LoBiondo, supra, 199 N.J. at 102. The Court has "authorized in principle a claim against an attorney who participated in a civil conspiracy with the goal of assisting a client to engage in a fraudulent transfer of assets to the detriment of a lender." Ibid. (citing Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177-78 (2005)).

We have also recognized that "[p]rivity between an attorney and a non-client is not necessary for a duty to attach 'where the attorney had reason to foresee the specific harm which occurred.'" Estate of Albanese v. Lolio, 393 N.J. Super. 355, 368-69 (App. Div.) (quoting Albright v. Burns, 206 N.J. Super. 625, 633 (App. Div. 1986)). Ultimately, in determining whether a duty exists, "[t]he primary question . . . is one of fairness." Id. at 369.

In this case, Innes knew that Liebowitz had been discharged, and that defendants were now representing Carrascosa. At that point, he could no longer reasonably rely upon Liebowitz's agreement to retain Victoria's passport. Absent such reliance, Liebowitz owed no duty of care to plaintiffs. Petrillo, supra, 139 N.J. at 482. Liebowitz could

not reasonably foresee that, armed with full knowledge of the agreement and his expressed caution regarding the passport, defendants would simply turn it over to Carrascosa. Absent any reliance by Innes upon Liebowitz's continued retention of the passport, it would be patently unfair to extend a duty to Liebowitz to safeguard the passport after he was discharged by Carrascosa. Albanese, supra, 393 N.J. Super. at 369.

Summary judgment was properly granted dismissing defendants' third-party complaint against Van Aulen and Liebowitz.

B.

Defendants argue the judge erred by denying their motion for summary judgment before trial. In essence, they contend the motion record failed to establish, and the judge did not find, that defendants owed Innes any duty, or that they made any representations upon which Innes reasonably relied.[7]

In denying defendants' summary judgment motion, the judge reasoned:

---

[7] Although not specifically contained in a point heading, defendants also contend the judge erred by denying them summary judgment on plaintiffs' alternative causes of action sounding in breach of contract, bailment, and breach of escrow. We need not address those issues because ultimately the case was submitted to the jury only as to the claim that defendants breached their professional duty.

> [L]iability may be imposed on [defendants], not merely because [defendants] violated an RPC, but because of the affirmative acts of [defendants], specifically, the letters [defendants] sent to Liebowitz, [defendants'] awareness of the Agreement regarding Victoria's United States passport, accepting the passport with Carrascosa's file, and the notes and deposition testimony of the [defendants'] associates referencing the importance of the United States passport.

The judge also concluded that a fact finder could determine that defendants should have foreseen Innes would rely upon them to retain Victoria's passport, return it to Liebowitz if they were not going to honor the agreement, or at least not let the passport fall into Carrascosa's hands.

We agree with defendants that whether a legal duty exists is a matter of law for the court. Petrillo, supra, 139 N.J. at 479. But, contrary to defendants' assertions, the motion judge decided there was a duty. We discern defendants' argument more precisely to be that since they made no affirmative representation to honor the agreement, imposing a duty upon them to maintain possession of Victoria's passport unreasonably extends existing precedent. We disagree.

As already noted, we have held a duty to a non-client may "attach where the attorney had reason to foresee the specific harm which occurred." Albanese, supra, 393 N.J. Super. at 368-69 (internal quotations omitted). It was entirely forseeable

that Carrascosa's possession of Victoria's passport would facilitate her ability to remove her daughter from the country.

A lawyer may also be liable to a non-client third party "where an independent duty is owed." Estate of Fitzgerald v. Linnus, 336 N.J. Super. 458, 468 (App. Div. 2001) (citing Davin, L.L.C., v. Daham, 329 N.J. Super. 54, 73-75 (App. Div. 2000); DeAngelis v. Rose, 320 N.J. Super. 263, 274-76 (App. Div. 1999)). "[E]ven absent an attorney-client relationship, an attorney 'owes a fiduciary duty to persons, though not strictly clients, who he knows or should know rely on him in his professional capacity.'" R. J. Longo Constr. Co. v. Schragger, 218 N.J. Super. 206, 209 (App. Div. 1987) (quoting Albright, supra, 206 N.J. Super. at 632-33).

In Davin, for example, attorney Jaffe prepared a multi-year lease that included a covenant for quiet enjoyment while representing the landlords as defendants in foreclosure proceedings involving the property. Davin, supra, 329 N.J. Super. at 63-64. Neither the landlords nor Jaffe advised the defendants-tenants of the foreclosure proceedings. Id. at 64. The motion judge granted summary judgment, "conclud[ing] that Jaffe owed no duty to [the] defendants since he had never represented them or spoke to them, and would have been acting adversely to the best interests of his clients, the [landlords],

if he advised [the] defendants of the [landlords'] financial difficulties. Id. at 73.

In reversing summary judgment, we said:

> The practice of law is a profession, not a business. An attorney is not merely a hired gun, but, rather, a professional required to act with candor and honesty. . . . Jaffe, as an attorney who participated to the extent he did in the efforts to stave off foreclosure, had an affirmative obligation to be fair and candid with [the] defendants. Moreover, he had an obligation not to insert the covenant of quiet enjoyment in the lease. He had an obligation to advise his clients . . . that they should disclose to defendants the fact that the property was in foreclosure. He also had a duty to advise his clients that the lease should not contain a covenant of quiet enjoyment in light of the fact that it was highly unlikely that [the] defendants would obtain the benefits of the covenant in light of the foreclosure. If they failed to follow his advice, he had the right, if not the duty, to cease representing them.

[Id. at 76-77, 78.]

We held that "the lawyer's duty of effective and vigorous representation of his client is tempered by his corresponding duty to be fair, candid and forthright." Id. at 78.

In denying defendants' summary judgment motion here, the judge properly concluded that, despite the lack of any affirmative representation, defendants owed a duty to Innes. If they were unwilling to abide by the agreement, they were obligated to so advise Van Aulen or Liebowitz. Simply giving

A-0387-11T1

the passport to Carrascosa was a breach of defendants' duty, even if they believed in good faith that the Agreement had been "repudiated."

Not only is this obligation entirely consistent with prior precedent, it is consistent with the <u>Rules of Professional Conduct</u> (<u>RPC</u>). While "a cause of action for malpractice cannot be based exclusively on the asserted breach of" an <u>RPC</u>, "it is clear that the [<u>RPCs</u>] may be relied on as prescribing the requisite standard of care and the scope of the attorney's duty to the client." <u>Gilles v. Wiley, Malehorn & Sirota</u>, 345 <u>N.J. Super.</u> 119, 125 (App. Div. 2001) (citing <u>Baxt v. Liloia</u>, 155 <u>N.J.</u> 190, 201 (1998)); <u>Davin</u>, <u>supra</u>, 329 <u>N.J. Super.</u> at 74 n.3). Therefore, a breach of an <u>RPC</u> "is evidential of [a] defendant's failure to comply with the required standard of care." <u>Id.</u> at 125-26 (citation omitted); <u>see also</u> <u>Johnson v. Schragger, Lavine, Nagy & Krasny</u>, 340 <u>N.J. Super.</u> 84, 90 (App. Div. 2001) (noting that "the Rules of Professional Conduct may provide guidance to the court in determining whether a duty exists").

<u>RPC</u> 1.15(a) requires a lawyer to appropriately safeguard the property of clients or third parties in his or her possession. <u>RPC</u> 1.15(b) obligates a lawyer to promptly notify a third party of receipt of property in which the third party has an interest. "Except as stated in this <u>Rule</u> or otherwise

permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any . . . property that the client or third person is entitled to receive." Ibid. The clear import of these RPCs is that, in light of the Agreement and Innes's competing claim to the passport as Victoria's father, defendants were not free to dispose of the passport as they saw fit. The judge properly denied defendants' motion for summary judgment.

## II.

We turn to the issues raised regarding the trial itself by first reviewing some of the testimony. Carrascosa was a Spanish citizen and an attorney admitted to practice in the European Union. Victoria was a citizen of both the United States and Spain. Innes was concerned that Carrascosa might take Victoria to Spain, and he noted that, while Victoria also had a Spanish passport, the family used the United States passport whenever it traveled to Spain.

Although the Agreement had been executed by both parties, problems arose immediately. On November 22, 2004, Carrascosa obtained a domestic violence temporary restraining order (TRO) against Innes. Liebowitz testified that he advised Carrascosa against the filing, "given [the] facts she was presenting to [him] in support of the restraining order." The issuance of the

TRO resulted in the suspension of Innes's parenting time with Victoria.[8]

On December 8, 2004, Liebowitz transferred his entire file, including Victoria's United States passport, to defendants. Efforts to negotiate a parenting time schedule thereafter were contentious and fruitless. Innes's last visit with his daughter took place on November 4, 2004.

Innes first learned that his daughter was in Spain when Marzano-Lesnevich disclosed the information to the Family Part judge during the hearing in February 2005. Innes subsequently was told by law enforcement authorities that Victoria left the country on January 13, 2005, with her maternal grandfather aboard a British Airways Flight to London. She and her grandfather then traveled from England to Spain.

Innes retained a Spanish lawyer, Elena Zarraluqui, to assist with filing a petition to return his daughter and contest the annulment proceedings that Carrascosa had commenced in Spain.[9] Innes went to Spain for a hearing in June 2005. The

---

[8] On December 6, 2004, the court dismissed the TRO against Innes at Carrascosa's request.

[9] Innes filed the application for Victoria's return to New Jersey under the Hague International Child Abduction Convention, 51 Fed. Reg. 10, 498 (March 26, 1986), its Federal implementing statute, the International Child Abduction Remedies Act (ICARA), 42 U.S.C.A. §§ 11601 to -11611 (1988), and the New Jersey court

(continued)

A-0387-11T1

Spanish court denied Innes's petition and ordered Victoria to remain in Spain until age eighteen. Innes, through Zarraluqui, filed several unsuccessful appeals.

Innes returned to Spain in fall 2005 for the nullity proceeding in which Carrascosa sought, among other relief, termination of his parental rights. According to Innes, at the time of the trial in this case, the issue remained undecided. During both trips to Spain, Innes briefly saw Victoria. Zarraluqui testified that she asked Carrascosa's lawyer if Innes and Victoria could speak to each other. Carrascosa initially agreed, but then tried to prevent Victoria from going to her father, and Carrascosa's lawyer had to intervene. Zarraluqui said that Victoria was "really kind with him," that Innes kissed her and started crying when Carrascosa ended the meeting after five or ten minutes. Zarraluqui described the scene as "very hard, emotional."

Innes never returned to Spain again, explaining that fourteen criminal complaints had been filed against him and three were still pending. He denied committing any crime or abusing Carrascosa or Victoria. Given the notoriety of the case

(continued)
order. Innes, supra, 391 N.J. Super. at 466. We discussed the proceedings in the Spanish courts in greater detail in our earlier decision. Innes, supra, 391 N.J. Super. at 466-72.

A-0387-11T1

and the wealth and position of Carrascosa's family, Innes believed he would be unjustly accused and imprisoned if he returned. Innes' attempts to maintain a relationship with Victoria were rebuffed by Carrascosa's family. Aside from a brief telephone conversation in 2007, he has not spoken to her since their 2005 meeting in the courthouse. The family refuses to accept delivery of the Christmas and birthday gifts Innes sends every year.

Innes testified extensively regarding his relationship with his daughter prior to her leaving the country in January 2005. He moved his office to the ground floor of the couple's high-rise apartment building so he could be close to home and see her frequently. After the couple separated, he saw Victoria nearly every day until Carrascosa ordered him to stay away.

Innes also stated that he thinks about "this whole situation" every day, cannot sleep and his business suffered. He received treatment from his doctor for anxiety, and he saw a therapist, who "helped [him] learn how to grieve the loss of [his] daughter," although he admitted seeing the therapist infrequently in 2009 and not at all since.

In 2006, Carrascosa returned to the United States for the divorce trial, leaving Victoria in Spain with her grandparents. On August 24, 2006, the Family Part granted the parties a

divorce, awarded Innes sole legal and residential custody of Victoria, ordered Carrascosa to dismiss all actions in Spain and return Victoria to New Jersey within ten days. The court imposed sanctions of $148,000 in favor of Innes. Carrascosa did not comply with any of these provisions.

Carrascosa was arrested in New York City in November 2006 and subsequently indicted. She was found guilty and sentenced to a prison term of fourteen years. At the time of trial, Carrascosa remained incarcerated and testified via video conference. She accused Innes of attempting to murder Victoria and said she filed the TRO because of Innes's "relentless stalking, abuse, [and] battering." She claimed that she signed the Agreement under duress and repudiated it "the very next day," something she told Marzano-Lesnevich.

Carrascosa claimed that she asked Jacobs to retrieve Victoria's passport from Liebowitz because she wanted to travel with her daughter. She told Innes about her plans, and he replied: "All right. Go ahead. Get on the boat." She also told another associate at the Lesnevich firm, Francesca Marzano-Lesnevich (Francesca),[10] who told Carrascosa "they had spoken to . . . Van Aulen on the phone and everything was okay." In an e-

---

[10] We apologize for the informality of using a first name; however, it is necessary to avoid confusion.

mail dated January 11, 2005, Carrascosa notified the Lesnevich firm that she was going to stop by. She then arrived in the reception area where Francesca gave her the passport. Carrascosa confirmed that she had never lost Victoria's Spanish passport, and that her daughter was still in Spain.

The judge conducted a N.J.R.E. 104 hearing and denied defendants' request to bar Conk as an expert witness.[11] Succinctly stated, Conk rendered the following opinion:

> It was the duty of Marzano-Lesnevich as successor in fact to the possessory right of Liebowitz to inform Innes via his attorney and Liebowitz, who reasonably expected Marzano-Lesnevich to abide by the agreement, that she intended to dispose of the passport as her client sought fit and that she was renouncing any obligation to operate under the constraints imposed by the agreement on her predecessor . . . attorney. If adequate notice of such intention had been given[,] Liebowitz could have retaken possession and Innes or his attorney could have sought the assistance of a court if a . . . new escrow agent, could not be agreed upon.

Thomas Kilbride, who worked for the Department of Homeland Security Immigration and Customs Enforcement (ICE), testified that he received a request from the Bergen County Prosecutor's Office to determine Victoria's travel history to and from the United States. His examination of ICE's database showed

---

[11] The trial judge was not the judge who had heard and decided the pre-trial motions.

Victoria left the country from Newark Liberty International Airport on January 13, 2005, using her United States passport, as she had on September 12, and December 11, 2003, and January 8, 2004. Kilbride acknowledged that a person with dual citizenship could depart the United States using a foreign passport, but his search failed to reveal any record of Victoria ever leaving the United States using her Spanish passport.

Plaintiffs read Marzano-Lesnevich's deposition testimony and defendants' interrogatory answers to the jury that implied Carrascosa took the passport without the firm's foreknowledge. However, Jacobs testified that Marzano-Lesnevich said she gave the passport to Carrascosa.

In her testimony before the jury, Marzano-Lesnevich admitted that she did not notify Innes or Van Aulen before giving Carrascosa her daughter's passport. She believed that because neither she nor Liebowitz held the passport in trust, Carrascosa, the parent with primary residential custody, had the right to safeguard the passport herself. Marzano-Lesnevich knew of the Agreement and that Carrascosa had signed it, but she maintained it was repudiated because no one had followed its terms.

Marzano-Lesnevich described the passport as "simply abandoned by . . . Liebowitz and placed in a file." She

 A-0387-11T1

maintained that she did not have the right to hold the passport absent a court order or successor agreement. Marzano-Lesnevich also testified that Victoria could have traveled using her Spanish passport and that an itinerary Carrascosa sent to the firm indicated mother and daughter intended to return to this country. However, the Spanish courts ordered Victoria to remain in Spain until she turned eighteen.

Marzano-Lesnevich acknowledged on cross-examination that her firm's strategy was to focus initially on jurisdiction, explaining that proceedings already had begun in Spain and it was important for Carrascosa to receive an ecclesiastical nullity of her marriage. She acknowledged that Carrascosa wanted the matter heard in Spain.

DeBartolo testified as an expert in the fields of family law and ethics. He opined that Liebowitz "should have notified . . . Van Aulen that he was seeking to terminate his role as escrow agent, he should have notified his client, he should have notified any successor attorney, he should have asked to be relieved of the obligations that he voluntarily undertook as an escrow agent, as a trustee." He also concluded that Marzano-Lesnevich did not violate professional standards by returning the passport to Carrascosa because she was not bound by the Agreement and never agreed to become trustee of the passport.

In DeBartolo's opinion, Marzano-Lesnevich properly relied on Carrascosa's representations that the agreement had been repudiated, and that Carrascosa had the superior property interest in the passport as the primary custodial parent.[12]

DeBartolo also opined that Carrascosa, not defendants, was the proximate cause of any damages. Even if Liebowitz had retained the passport in trust or properly obtained a substitute trustee, DeBartolo believed Carrascosa could have easily traveled with Victoria using her Spanish passport.

---

[12] On cross-examination, however, DeBartolo acknowledged that our prior opinion affirmed the enforceability of the Agreement. There, we said that

> [u]nder New Jersey law and the Hague Convention, the October parenting agreement was valid, affirmed Carrascosa's intent that Innes have custodial rights in the child, and when plainly read, demonstrates that the removal of the child was wrongful. Indeed, Article 3 of the Convention provides that custody rights may arise "by operation of law, or by reason of an agreement having legal effect under the law of that State." The parenting agreement having been voluntarily and knowingly executed by both parents, and thus enforceable under the laws of New Jersey, Carrascosa's breach of that agreement was wrongful and violated Innes' custodial rights.
>
> [Innes, supra, 391 N.J. Super. at 486.]

Defendants moved to dismiss the complaint at the close of plaintiffs' case. See R. 4:37-2(b). They argued plaintiffs failed to prove the release of Victoria's United States passport was a proximate cause of any damages. The judge denied the motion. Defendants renewed the argument post-verdict when they sought a new trial or JNOV, specifically contending that the finding of proximate cause was "against the weight of the evidence[.]" The judge denied the motion in a brief written opinion.[13] Defendants now renew this argument before us.

Motions for involuntary dismissal, Rule 4:37-2(b), and JNOV, Rule 4:40-2(b), are "governed by the same evidential standard: [I]f, accepting as true all the evidence which supports the position of the party defending against the motion and according [her] the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable

---

[13] In his written opinion, the judge noted that defendants also sought a new trial or JNOV because "the jury's finding[] regarding . . . Marzano-Lesnevich's deviation from the standard of care" was against the weight of the evidence. However, that contention was not advanced during oral argument on the motion. To the extent defendants argue that point in their appellate brief, we reject the contention. In light of the standards of review we discuss in this section, the trial testimony and with our discussion in section I.B., supra, regarding the duty owed to a non-client demonstrates the argument lacks sufficient merit to warrant further consideration. R. 2:11-3(e)(1)(E).

minds could differ, the motion must be denied." Verdicchio v. Ricca, 179 N.J. 1, 30 (2004) (first alteration in original) (citations omitted). We apply the same standard on review. Estate of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000).

"The trial judge's obligation on a motion for a new trial because the verdict is said to be against the weight of the evidence is quite a different and more difficult one." Dolson v. Anastasia, 55 N.J. 2, 6 (1969). Under Rule 4:49-1(a), a court shall grant a motion for a new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." Ibid. The judge must take into account "not only tangible factors . . . as shown by the record, but also appropriate matters of credibility, generally peculiarly within the jury's domain, . . . and the intangible 'feel of the case' . . . gained by presiding over the trial." Dolson, supra, 55 N.J. at 6. We apply a similar standard, deferring to the trial court's assessment of those factors "which are not transmitted by the written record." Id. at 7. Thus, "[a]n appellate court may overturn a jury verdict 'only if [that] verdict is so far contrary to the weight of the evidence as to give rise to the inescapable conclusion of mistake, passion, prejudice, or

partiality.'" <u>Kassick v. Milwaukee Elec. Tool Corp.</u>, 120 <u>N.J.</u> 130, 134 (1990) (quoting <u>Wytupeck v. City of Camden</u>, 25 <u>N.J.</u> 450, 466 (1957)).

To prevail at trial, plaintiffs needed to establish that defendants' breach of their professional duty was <u>a proximate cause</u> of their damages. <u>Conklin</u>, <u>supra</u>, 145 <u>N.J.</u> at 416. When there are concurrent independent causes of harm, the jury must determine whether the negligence was a substantial factor in bringing about the ultimate harm. <u>Id.</u> at 422; <u>see also</u> <u>Froom v. Perel</u>, 377 <u>N.J. Super.</u> 298, 313 (App. Div.) ("plaintiff must present evidence to support a finding that defendant's negligent conduct was a 'substantial factor' in bringing about plaintiff's injury, even though there may be other concurrent causes of harm"), <u>certif. denied</u>, 185 <u>N.J.</u> 267 (2005).

Here, the undisputed evidence was that Victoria exited the country using her United States passport. Whether Victoria could have used her Spanish passport, or even whether her Spanish passport was necessary for her entry into Spain, does not matter. Defendants' release of the United States passport was a "substantial factor" in bringing about the damages plaintiffs claimed to have suffered.

Defendants moved pre-trial to dismiss plaintiffs' claim for emotional distress damages, and the judge reserved decision. At trial, plaintiffs called Janet S. Berson, a licensed clinical psychologist, as an expert regarding the effects of parental alienation on Innes and Victoria. However, following a Rule 104 hearing, the judge precluded Berson from testifying, finding that she could not testify within a reasonable degree of psychological certainty, in part because she had never examined Victoria and her opinions were based on an out-of-date psychological report from Spain. Plaintiffs do not challenge that ruling on appeal.

At the close of plaintiffs' case, defendants moved to dismiss Victoria's emotional distress claims. The judge considered the motion as if it applied to both plaintiffs. He concluded that "under traditional tort concepts the loss of the child's society and companionship could give rise to emotional distress." Citing our decision in Segal v. Lynch, 413 N.J. Super. 171 (App. Div.), certif. denied, 203 N.J. 96 (2010), the judge noted such circumstances "clearly engender[] a right to compensation," and he concluded that emotional distress damages could be presumed without evidence of physical injury or expert psychological testimony.

Following lengthy debate during the charge conference, the judge provided the following instruction to the jury:

> If you find in favor of the plaintiffs, the law recognizes as a proper item for recovery the mental suffering and distress that a person may endure as a result of the wrongful conduct of a defendant in a case such as the one before you. Since a parent is entitled to the services and companionship of a minor child, until that child reaches majority, you may award damages to . . . Innes for the loss of his daughter's companionship and society for as long as you reasonably and rationally conclude it has and will last. The measure of damages is what a reasonable person would consider to be adequate and just under all of the circumstances.
>
> Likewise, Victoria . . . is entitled to damages for the mental suffering and distress which she may endure as a result of being separated from her father.

When they moved for a new trial or JNOV, defendants reiterated the argument, which the judge rejected.

### (i)

Before us, defendants argue it was error to submit the issue of emotional distress damages to the jury because in a legal malpractice action emotional distress damages cannot be awarded "in the absence of medical evidence establishing substantial bodily injury or severe and demonstrable psychiatric sequelae proximately caused by the tortfeasor's misconduct." Gautam v. De Luca, 215 N.J. Super. 388, 399 (App. Div.), certif.

denied, 109 N.J. 39 (1987).  Defendants specifically argue that there was no such medical evidence in this case as to either Innes or Victoria.

It is well-established that a plaintiff "'may recover for losses which are proximately caused by the attorney's negligence or malpractice.'"  Saffer v. Willoughby, 143 N.J. 256, 271 (1996) (quoting Lieberman v. Employers Ins. of Wausau, 84 N.J. 325, 341 (1980)).  The availability of emotional distress damages in a legal malpractice case has not been subject to extensive discussion in reported decisions in New Jersey.

In Gautam, the plaintiffs alleged that their attorneys' malpractice resulted in the dismissal of the plaintiffs' medical negligence claim.  Gautam, supra, 215 N.J. Super. at 391-92. The "[p]laintiffs made no effort to establish the viability or value of their underlying medical malpractice action.  Rather, they sought to recover damages for the mental anguish and emotional distress allegedly caused by the legal malpractice." Id. at 390.  Plaintiffs testified "that they developed various psychological problems because of their dashed expectations." Id. at 392.  The jury awarded both compensatory and punitive damages against the defendants.  Id. at 394.  Although we reversed because of the inadequacy of the jury instructions, id. at 394-96, we concluded that a remand was unnecessary because

"the evidence was wholly insufficient to support a recovery of either compensatory or punitive damages." Id. at 396.

We began by noting "[t]he general rule is that an attorney is responsible for the loss proximately caused the client by his negligence." Id. at 397. "[T]he measure of damages is ordinarily the amount that the client would have received but for his attorney's negligence." Ibid. (citing Lieberman, supra, 84 N.J. at 342). We recognized that damages would often be proven by the "suit within a suit" method, that is "by introducing evidence establishing the viability and worth of the claim that was irredeemably lost." Ibid. However, we also recognized the Court "eschewed rigid application of the 'suit within a suit' principle in favor of a more flexible rule." Id. at 398; see also Garcia v. Kozlov, Seaton, Romanini & Brooks, P.C., 179 N.J. 343, 361 (2004) (leaving it to the "court's discretion to declare an appropriate trial model").

We were also "persuaded that emotional distress damages should not be awarded in legal malpractice cases at least in the absence of egregious or extraordinary circumstances." Gautam, supra, 215 N.J. Super. at 399. "Whether viewed within the context of the traditional concept of proximate cause, or simply as a matter of sound public policy, we are convinced that damages should be generally limited to recompensing the injured

party for his economic loss." Ibid. (internal citations omitted) (emphasis added). We observed that "the relationship between the parties was predicated upon economic interest[,] [and] [t]he loss, if one occurred, was purely pecuniary." Id. at 400.

We further noted that "[e]ven if emotional distress damages were recoverable in legal malpractice actions, such awards would be impermissible in the absence of medical evidence establishing substantial bodily injury or severe and demonstrable psychiatric sequelae proximately caused by the tortfeasor's misconduct." Id. at 399. "Aggravation, annoyance and frustration, however real and justified, constitute unfortunate products of daily living. Damages for idiosyncratic psychiatric reactions should not be permitted." Id. at 400. We also acknowledged that "the outer-most boundaries of the law dealing with emotional distress damages are not yet visible," but the facts of the case did not permit such an award. Ibid.

We continued to recognize Gautam's general principles in Winstock v. Galasso, 430 N.J. Super. 391 (App. Div.), certif. denied, 215 N.J. 487 (2013). There, the plaintiffs, a police officer and his wife, filed a legal malpractice claim against their attorney who had provided them with advice concerning the legality of operating a club hosting poker games. Id. at 399-

401.  The plaintiffs were subsequently arrested and criminally charged with perjury and various gambling offenses.  Id. at 408.  As part of a global plea agreement with the State, the husband entered a guilty plea and his wife entered the Pre-Trial Intervention Program.  Id. at 395.  As a result, the husband forfeited his position as a police officer.  Id. at 409.

Although we reversed summary judgment dismissing the plaintiffs' complaint, we affirmed the motion judge's dismissal of the plaintiffs' emotional distress claim.  Citing Gautam, supra, 215 N.J. Super. at 399, we noted, "[t]here is nothing in the record before us that substantiates a finding of 'egregious or extraordinary circumstances' warranting this form of relief." Id. at 418-19.

The only other reported decision from our courts that directly addresses the issue is Kohn v. Schiappa, 281 N.J. Super. 235, 236-37 (Law Div. 1995), in which the court considered whether damages for emotional distress were recoverable when the attorney was retained to pursue the purely non-economic interests of his clients.  In that case, the plaintiffs retained defendant to assist them in adopting a child.  Id. at 241.  They alleged that the attorney erroneously disclosed confidential information in the adoption complaint and claimed this breach caused them to suffer severe emotional

distress.  Id. at 237.  The court denied the defendant's motion

for summary judgment and distinguished Gautam:

> While Gautam held that damages should be
> limited to recompensating the injured party
> for his economic loss, . . . that court was
> not asked to consider, nor did it address,
> whether damages for emotional distress were
> recoverable in cases involving non-economic
> claims where the "suit within a suit"
> framework is inapplicable.  Consequently, it
> cannot be said that Gautam forecloses a
> plaintiff from alleging severe emotional
> distress where the underlying representation
> was for non-economic purposes.
>
> [Id. at 241 (internal quotation marks and
> citation omitted).]

The Law Division explained that, in an adoption or similar

proceeding, such as contested child custody disputes, attorneys

would have virtual immunity for their negligence if plaintiffs

had no ability to seek emotional distress damages.  Id. at 238-

39, 241-42.

Two reported federal district court decisions also have

distinguished Gautam so as to permit the assertion of emotional

distress damages in a legal malpractice claim when the client's

interest was non-pecuniary in nature.  First, in Lawson v.

Nugent, 702 F.Supp. 91, 92 (D.N.J. 1988), the plaintiff brought

a legal malpractice claim against his attorney whose alleged

malpractice resulted in an additional twenty months of

confinement upon conviction.  The plaintiff sought damages for

the "emotional anguish he sustained" as a result. Ibid. The court distinguished the case from Gautam, noting "[t]he relationship between plaintiff-client and defendant-attorney was not necessarily predicated upon economic interest." Id. at 93. The court observed that because this was a "diversity case," it "must decide the issues in accordance with the law of New Jersey." Id. at 94. Further noting that "[d]amages for emotional distress have been allowed by New Jersey courts in an increasing number and variety of contexts," ibid., the court concluded that the "plaintiff should be allowed to prove damages for emotional distress attributable to the extra twenty months of confinement in a maximum security penitentiary." Id. at 95.

In Snyder v. Baumecker, 708 F.Supp. 1451, 1453 (D.N.J. 1989), the plaintiff brought suit on behalf of herself and the estate of her son, who committed suicide while in custody for motor vehicle offenses. One of the defendants was her son's court-appointed attorney, who allegedly committed malpractice. Id. at 1453, 1462. Citing its prior decision in Lawson, supra, the court again distinguished Gautam, noting that the attorney-client relationship there was "predicated on an economic interest, while . . . in the case at bar, the attorney was retained to provide a defense to a criminal prosecution, thus making emotional distress, in the latter situation, a reasonably

foreseeable consequence of an attorney's malpractice." Id. at 1464.

Kohn's holding that emotional distress damages are recoverable in a legal malpractice case where non-economic interests are at stake has been described as the "minority rule." Leonard v. Walthall, 143 F.3d 466, 468 (8th Cir. 1998). In Leonard, the plaintiffs alleged negligence in the defendant's representation of their interests in an adoption. Id. at 467. The Eighth Circuit was asked to predict "whether, under Arkansas law, plaintiffs may recover damages for their alleged emotional distress resulting from defendant's negligent conduct, notwithstanding the undisputed fact that plaintiffs have suffered no physical injury or harm to a personal or economic interest." Id. at 468. Relying upon the decision in Thornton v. Squyres, 877 S.W.2d 921 (Ark. 1994), which involved the plaintiff's "claim of outrage . . . based upon allegations that her attorney mishandled her divorce and thus caused her temporarily to lose custody of her child," the Leonard court affirmed dismissal of the plaintiffs' complaint. Ibid.; see also Taylor v. Paskoff & Tamber, LLP, 908 N.Y.S.2d 861, 863 (Sup. Ct. 2010) (rejecting claims for emotional distress damages in a legal malpractice action involving representation in adoption or custody matters).

However, nearly a quarter of a century ago, one commentator recognized "an emerging trend . . . that allows a client to recover for emotional distress." Kelleher, Joseph J., "An Attorney's Liability for the Negligent Infliction of Emotional Distress," 58 Fordham L. Rev. 1309, 1319 (1990). This "developing trend emphasizes the client's injured interest in determining the extent of the attorney's liability for emotional distress damages." Id. at 1320. "Where the attorney is protecting a pecuniary interest, emotional distress damages are severely limited[,] [but] [w]here the interest is personal, . . . courts adopting this view are more willing to compensate emotional harm." Id. at 1320-21.

In Miranda v. Said, 836 N.W.2d 8, 11-13 (Iowa 2013), relying upon their attorney's advice, the plaintiffs voluntarily left their children behind in the United States and returned to their native Ecuador, from where they intended to emigrate legally. When they attempted to return, they learned that they were subject to a ten-year bar because they had voluntarily left this country. Id. at 12. The Iowa Supreme Court concluded that the facts presented warranted an exception to the general rule that denied recovery of emotional distress damages in a legal malpractice case. Id. at 33. The court noted it "is generally foreseeable that emotional distress would accompany the

41

prolonged separation of a parent and child." Id. at 32 (citing McEvoy v. Helikson, 562 P.2d 540, 542, 544 (Or. 1977), superseded by rule on other grounds, Moore v. Willis, 767 P.2d 62, 64 (Or. 1988); Person v. Behnke, 611 N.E.2d 1350, 1353 (Ill. App. Ct.), appeal den., 622 N.E.2d 1226 (Ill. 1993)). The Miranda court concluded such damages are appropriate where "[t]he relationship involved a transaction charged with emotions in which negligent conduct by the attorney was very likely to cause severe emotional distress." Id. at 33.

In Person, supra, 611 N.E.2d at 1353, the Illinois appeals court recognized "a valid claim . . . for noneconomic damages resulting from a plaintiff's loss of custody and visitation of his children which allegedly resulted from an attorney's negligence."

McEvoy presents strikingly similar circumstances to this case. The plaintiff-father brought suit against his ex-wife's attorney. McEvoy, supra, 562 P.2d at 541. Pursuant to the divorce decree, the plaintiff was awarded custody of the couple's child. However, a subsequent order, executed by all parties and the attorneys, gave the mother, a Swiss citizen, temporary custody, subject to both parents delivering all passports to the defendant until the child was returned to her father. Ibid. The plaintiff alleged that the defendant failed

to honor the order and gave his daughter's passport to his ex-wife, permitting the child to be removed to Switzerland. Id. at 542.

The court reversed the lower court's dismissal of the complaint. Id. at 544. It concluded that "conduct by defendant which resulted in an infringement of" the plaintiff's right to custody of his daughter, "if established by evidence on trial, would entitle [the] plaintiff to recover damages for anguish and mental [suffering] due to the loss of his minor child, as alleged in the complaint." Ibid. (citations omitted) (second alteration in original).

We conclude that plaintiffs' claim for emotional distress damages was clearly appropriate under the facts of this case. We do not view this as an unwarranted extension of what we said in Gautam, specifically that emotional distress damages are generally unavailable in a legal malpractice action absent "egregious" and "extraordinary" circumstances. Gautam, supra, 215 N.J. Super. at 399. We used those terms in Gautam to deny a claim in the context of a "relationship between the parties" "predicated upon economic interest," where the plaintiffs' loss "was purely pecuniary." Id. at 400; and see Restatement (Third) of the Law Governing Lawyers, § 53 comment g. (2000) (emotional

distress "damages are inappropriate in types of cases in which emotional distress is unforeseeable").

However, when the harm caused by an attorney's professional negligence is personal in nature and emanates from the fundamental relationship between parent and child, we must assess whether it was "egregious" and "extraordinary" through a different prism.  The trial judge specifically relied upon our decision in Segal.

There, a father brought suit on behalf of himself and his children against the children's mother for intentional infliction of emotional distress based on alienation of the children's affections.  Segal, supra, 413 N.J. Super. at 176-77. For essentially two different reasons, we concluded that the plaintiff's complaint was properly dismissed by the Law Division.

First, we noted that the suit presented a "litigation tug-of-war" with the children in the middle.  Id. at 189.  We were "satisfied that [the] plaintiff's cause of action . . . constitute[d] a prima facie case of potential harm to the children named as parties thereto."  Id. at 190-91.  "As a matter of public policy," we concluded that plaintiff's "grievances" must be brought in the Family Part "as part of an action for custody or parenting time, where the governing

principle for adjudication will be the best interests of these two children." Id. at 192.

We also concluded that the plaintiff had "not established a cause of action for intentional infliction of emotional distress." Id. at 191. We noted that, among other things, the elements of that tort required a showing that the "defendant's conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community[.]'" Ibid. (quoting Buckley v. Trenton Sav. Fund Soc., 111 N.J. 355, 366 (1988)). Although the plaintiff failed to allege such conduct in the case, we specifically did not

> foreclose the possibility that a cause of action may be brought alleging facts that are so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community, thus satisfying prong two of the Buckley standard. . . . As we previously noted, cases involving prolonged parental abduction, where children are intentionally removed to foreign jurisdictions for the purpose of frustrating the innocent parent's custodial rights, or intentional false accusations of parent/child sexual abuse, are but two examples of factual scenarios that may satisfy the outrageous conduct requirement under Buckley.
>
> [Id. at 192 (internal quotation marks and citation omitted) (emphasis added).]

Defendants contend that applying Segal here would be an unwarranted "extension of liability for a client's intentional infliction of emotional distress to the tortfeasor's attorney by way of a legal malpractice claim[.]" We do not necessarily agree. However, we need not directly address that contention because we conclude that Segal does have relevance to the extent that it explained the kind of "egregious" and "extraordinary" conduct that, when combined with the personal interests at stake, permit recovery for emotional distress damages in an action sounding in legal malpractice.

We hasten to add that most factual situations will not support such a claim, even when the underlying interests are non-pecuniary and personal in nature. We view the "egregious" and "extraordinary" qualifier as a sensible limitation on what might otherwise become an increasing slew of litigation arising out of the obviously emotionally-charged proceedings that occur daily in the Family Part. So, for example, absent egregious and extraordinary circumstances, a client's claim that his attorney's malpractice resulted in an order awarding custody to his adversary or limiting his parenting time would not support an award of emotional distress damages. In such situations, the deprivation to the client can be fully redressed by the Family Court through applications addressed to the sound discretion and

equitable powers of the judge, including future modification of the award. To the extent <u>Kohn</u> suggested otherwise, we disapprove it.[14]

Moreover, permitting claims for emotional distress in a legal malpractice action, even one centered on the client's personal as opposed to pecuniary interests, might provide thinly-veiled cover for damage claims attributable to the unfortunate, but well-recognized, anxiety that accompanies litigation in all forms. <u>See</u> <u>Picogna v. Bd. of Educ. of Cherry Hill</u>, 143 <u>N.J.</u> 391, 399 (1996) (denying "litigation-induced" stress as a component of emotional distress damages).

In this case, however, defendants' actions were "egregious" and "extraordinary." Despite knowing of the Agreement, including that it had been signed by the parties and the attorneys, the already contentious nature of the parties' separation and Innes's reliance on the safekeeping of Victoria's passport, defendants breached their duty and simply gave the passport to Carrascosa. They did so without notifying Van Aulen and without seeking approval from the court. Defendants'

---

[14] Because the issue is not before us, we specifically do not decide whether the deprivation of a liberty interest, like the facts presented in <u>Lawson</u>, <u>supra</u>, and <u>Snyder</u>, <u>supra</u>, is the kind of personal interest that would support an award of emotional distress damages in a legal malpractice action either with, or without, proof of egregious and extraordinary circumstances.

conduct was sufficiently "egregious" and "extraordinary" to permit an award of emotional distress damages in this case.

(ii)

Defendants argue that plaintiffs presented insufficient evidence of emotional distress damages because they failed to prove, through expert medical testimony or otherwise, that they suffered "demonstrable psychiatric sequelae proximately caused" by defendants' negligence. Gautam, supra, 215 N.J. Super. at 399. To address this argument, we need to consider the origin of the requirement for this "heightened showing of emotional distress." Menorah Chapels at Millburn v. Needle, 386 N.J. Super. 100, 116 (App. Div.) (citations omitted), certif. denied, 188 N.J. 489 (2006).

Whether it is alleged that the defendant acted intentionally, recklessly or negligently, the Court has said that recovery lies only if the plaintiff can prove the emotional distress produced by the defendant's tortious conduct was "severe," Buckley, supra, 111 N.J. at 367, or "genuine and substantial." Decker v. Princeton Packet, Inc., 116 N.J. 418, 430 (1989). "'Severe emotional distress means any type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so . . . .'" Taylor v. Metzger, 152 N.J. 490, 515 (1998)

(quoting <u>Poole v. Copland, Inc.</u>, 481 <u>S.E.</u>2d 88, 93 (N.C. 1997)). "Although New Jersey permits recovery for emotional distress damages in some cases, the potential for fabricated claims justifies a requirement of enhanced proof to support an award of such damages."  <u>Picogna</u>, <u>supra</u>, 143 <u>N.J.</u> at 396-397.

"By circumscribing the cause of action with an elevated threshold for liability and damages, <u>courts have authorized legitimate claims</u> while eliminating those that should not be compensable."  <u>Buckley</u>, <u>supra</u>, 111 <u>N.J.</u> at 367 (emphasis added). As the Court said in <u>Decker</u>,

> While the foreseeability of injurious consequences is a constituent element in a tort action, foreseeability of injury is particularly important in the tort of negligent infliction of emotional harm. <u>This reflects the concern over the genuineness of an injury consisting of emotional distress without consequent physical injury</u>. <u>In these situations, there must be "an especial likelihood of genuine and serious mental distress, arising from special circumstances, which serves as a guarantee that the claim is not spurious."</u> In emotional distress cases, there has been <u>"a constant concern about the genuineness of the claim."</u>
>
> [116 <u>N.J.</u> at 429-30 (quoting  W. Keeton, D. Dobbs, R. Keeton & D. Owen, <u>Prosser and Keeton on the Law of Torts</u>, § 54 at 362 (5th ed. 1984)) (emphasis added).]

Our courts have recognized two types of tortious conduct that support a claim for negligent infliction of emotional

distress. "A claim of direct, negligent infliction of emotional distress," can exist where the plaintiff claims proximately-caused damages as a result of the breach of a duty owed by the defendant. Lascurain v. City of Newark, 349 N.J. Super. 251, 277 (App. Div. 2002). A second type of claim, first recognized in Portee v. Jaffee, 84 N.J. 88, 101 (1980), exists if the plaintiff witnessed the death or serious physical injury of another, with whom he shares a marital or intimate, familial relationship, as the result of the defendant's negligence. McDougall v. Lamm, 211 N.J. 203, 214-215 (citing Portee, supra, 84 N.J. at 101). In both, the plaintiff must demonstrate "severe emotional distress," id. at 215, or "genuine and substantial emotional distress." Lascurain, supra, 349 N.J. Super. at 277.

"'The severity of the emotional distress raises both questions of law and fact. Thus, the court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved.'" Lascurain, supra, 349 N.J. Super. at 279 (quoting Buckley, supra, 111 N.J. at 367). We have said that "[i]n order to be actionable, the claimed emotional distress must be sufficiently substantial to result in physical illness or serious psychological sequelae." Aly v. Garcia, 333 N.J. Super. 195, 204 (App. Div. 2000).

Complaints such as lack of sleep, aggravation, headaches and depression have been frequently deemed insufficient as a matter of law. DeAngelis v. Hill, 180 N.J. 1, 20-21 (2004); Buckley, supra, 111 N.J. at 368; see also Juzwiak v. Doe, 415 N.J. Super. 442, 453 (App. Div. 2010) (finding complaints of "weight loss, sleeplessness, anxiety and depression" without "objective documentation of [the] claims" to be insufficient); Lascurain, supra, 349 N.J. Super. at 280; but see Wigginton v. Servidio, 324 N.J. Super. 114, 123-24, 132 (App. Div. 1999) (finding the plaintiff's sixty-day medical leave of absence from work and symptoms of "nausea and diarrhea" and depression sufficiently severe to allow her to proceed to trial on an emotional distress claim), certif. denied, 163 N.J. 11 (2000).

We acknowledge that Innes's testimony regarding his own emotional distress was quite limited, and no expert medical evidence was introduced on his behalf. As noted, Berson did not qualify as an expert witness regarding Victoria's emotional distress claims, and there was no proof otherwise from any witness.

The trial judge cited Rendine v. Pantzer, 141 N.J. 292, 312-13 (1995), for the proposition that expert medical evidence of plaintiffs' emotional distress was unnecessary. Undoubtedly, that was part of the Court's holding in Rendine. However, the

Court's decision in that case was based upon both the broad remedial purpose of the Law Against Discrimination, (LAD), N.J.S.A. 10:5-1 to -42, and the then recently-enacted amendment, N.J.S.A. 10:5-3, that specifically recognized "emotional stress" as cognizable damages under the statute. Rendine, supra, 141 N.J. at 312. In this case, plaintiffs' claims for emotional distress damages were allegedly the result of defendants' negligence. Unlike Rendine, there was no broad, statutorily-created remedy that necessarily relieved plaintiffs of their burden to prove "severe" or "genuine and substantial" emotional distress.

However, in certain circumstances, "[t]he Court has distinguished a cause of action in tort or contract seeking consequential damages for emotional distress from a cause of action alleging intentional infliction of emotional distress, holding that only the latter requires a heightened showing of emotional distress." Menorah Chapels, supra, 386 N.J. Super. at 116. For example, "[c]ourts have required little or no proof with regard to intangible damages for malicious use of process, apparently in the belief that a normal person subjected to wrongful litigation would have suffered at least some damages." Baglini v. Lauletta, 338 N.J. Super. 282, 307 (App. Div. 2001) (internal quotation marks and citation omitted).

We also rejected the need for an enhanced standard of proof in Geler v. Akawie, 358 N.J. Super. 437 (App. Div.), certif. denied, 177 N.J. 223 (2003). There, the plaintiffs brought a medical malpractice claim against various doctors based upon the "wrongful birth" of their son, who was stricken with Tay-Sachs disease and died within two years of his birth. Id. at 443. The trial judge granted the defendant-doctor's motion for JNOV on the jury's award of emotional distress damages. Id. at 444. In reversing, we held that the "elevated standard" for emotional distress claims did not apply. Id. at 450.

> [W]e note a distinction between the judicial treatment of claims for parental emotional distress arising from negligence directed solely at the parents, as here, and claims for parental emotional distress arising from negligence also directly affecting their newborn child. This case falls within the former category, and thus squarely within Supreme Court precedent recognizing, without mention of an enhanced standard of proof, parental emotional distress as an element of damages in other genetic counseling malpractice contexts.
>
> [Ibid. (citing Berman v. Allan, 80 N.J. 421 (1979)).]

We also recognized that "an award of damages for emotional distress . . . [was] one of the few avenues of redress for tortious conduct in this circumstance." Id. at 451.

In this case, plaintiffs did not seek emotional distress damages under the rubric of negligent or intentional infliction

of emotional distress, torts whose essential elements require a "heightened showing" of physical or psychological sequelae. <u>Menorah Chapels</u>, <u>supra</u>, 386 <u>N.J. Super.</u> at 116. Rather, plaintiffs sought damages as the direct and proximate consequence of defendants' breach of their professional responsibility.

Under the particular facts of this case, plaintiffs were entitled to recover for emotional distress damages without enhanced proof based upon the particular, and foreseeable, consequence of defendants' breach of the duty owed, i.e., the complete, and potentially, permanent rupture of the parent-child bond. The nature of this particular harm mitigates against the reason for an enhanced standard of proof in the first instance — the elimination of spurious claims. In such "'special circumstances,'" "'an especial likelihood of genuine and serious mental distress . . . serves as a guarantee that the claim is not spurious.'" <u>Strachan v. John F. Kennedy Mem. Hosp.</u>, 109 <u>N.J.</u> 523, 537 (1988) (quoting Prosser, <u>supra</u>, § 54 at 362).

For example, in <u>Menorah Chapels</u>, <u>supra</u>, 386 <u>N.J. Super.</u> at 106, 116, we reversed dismissal of the defendant's counterclaim seeking emotional distress damages as a result of the plaintiff's alleged breach of a contract to perform funeral services in strict accordance with orthodox Jewish custom and

belief.  We found it was foreseeable that, because the contract implicated interests so personal and particular to the defendant, the plaintiff's breach would result in mental anguish.  Id. at 115-18; and see Muniz v. United Hospitals Medical Center Presbyterian Hospital, 153 N.J. Super. 79, 82 (App. Div. 1977) (reversing dismissal of the plaintiff's complaint against the defendant-hospital, noting "a deviation from the standard of care reasonably to be expected of a hospital in dealing with corpses and the reasonable foreseeability that such a deviation would cause emotional and substantial physical disability with respect to persons normally constituted").

In Berman, supra, 80 N.J. at 433, the Court recognized the plaintiffs' claims for emotional distress damages against the defendant doctors who "directly deprived [the mother] . . . of the option to accept or reject a parental relationship with the child[,] and thus caused them to experience mental and emotional anguish upon their realization that they had given birth to a child afflicted with Down's Syndrome."  Justice Handler wrote eloquently, "[b]ecause of the unique nature of the tort, involving as it does the denial of the opportunity to decide whether to become the parents of a handicapped child, the suffering of the parents assumes another, important dimension."

Id. at 439 (Handler, J., concurring in part, dissenting in part); see also Portee, supra, 84 N.J. at 101 (where the court noted that the "interest in personal emotional stability is worthy of legal protection against unreasonable conduct," when the "emotional harm follow[s] the perception of the death or serious injury to a loved one . . . , for few persons travel through life alone").

In this case, Innes's testimony was sufficient to permit the jury to award him emotional distress damages proximately caused by defendants' breach of their duty. Unlike Gautam, supra, 215 N.J. Super. at 400, where "the relationship between the parties was predicated upon economic interest[,] [and] [t]he loss, if one occurred, was purely pecuniary[,]" the loss in this case was particularly personal in nature - the inability of a father to see his daughter for many years, and the likely prospect that he may never see her again. The New Jersey Supreme Court has long recognized that "'[t]he right to . . . raise one's children [is an] essential, basic civil right[,] . . . far more precious than property rights.'" N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986) (first alteration in original) (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212, 31 L.Ed. 2d 551, 558 (1972)). The emotional distress caused by the irreparable

severance of the parent-child bond is expected, undoubtedly genuine and easily appreciated by the average person without the need for expert testimony.

Furthermore, there is no other form of redress for defendants' tortious conduct in this case. <u>Geler</u>, <u>supra</u>, 358 <u>N.J. Super.</u> at 451. "Any other ruling would in effect immunize [defendants] from liability[.]" <u>Berman</u>, <u>supra</u>, 80 <u>N.J.</u> at 432. We therefore affirm the award of emotional distress damages to Innes.[15]

We are, nevertheless, compelled to reach a different result with respect to the award on Victoria's behalf. There was simply no testimony regarding her emotional distress, meaning the jury's award was based upon speculation. <u>See Jablonowska v. Suther</u>, 195 <u>N.J.</u> 91, 102 (2008) (where, discussing historical limits on claims for emotional distress, the Court noted that "[f]rom a policy standpoint, courts . . . feared a 'flood of litigation[ ] in cases . . . <u>where the damages must rest upon mere conjecture and speculation</u>'") (quoting <u>Ward v. W. Jersey & Seashore R.R. Co.</u>, 65 <u>N.J.L.</u> 383, 386 (Sup. Ct. 1900) (emphasis added)).

---

[15] Defendants have not specifically challenged the amount of the award.

Although Berson did not testify before the jury, during the N.J.R.E. 104 hearing, she was asked "what effect, if any, do you know of that the alienation [from her father] had upon [Victoria]?" Berson answered, "I don't know this particular child. So I can't possibly answer that." Plaintiffs contend that they were denied the opportunity to have Victoria evaluated because of defendants' actions. We cannot determine on this record whether that is necessarily true, but the trial judge rejected that excuse as a reason to permit Berson's testimony. We therefore reverse that part of the judgment awarding emotional distress damages to Victoria.

## C.

Citing Packard-Bamberger & Co. v. Collier, 167 N.J. 427 (2001), and Saffer, supra, 143 N.J. at 256, the judge observed that clients could recover reasonable expenses and attorney's fees as consequential damages for an attorney's negligence. He explained that even though plaintiffs were not defendants' clients, defendants owed them a duty to hold Victoria's passport in trust, and defendants knew or should have known of Inness's reliance upon them.

Defendants contend it was error to award plaintiffs attorneys' fees because "the narrow exception to the American

Rule in the context of a legal malpractice action" does not apply since Innes was not defendants' client. We disagree.[16]

The American Rule prohibits the prevailing party from recovering counsel fees against the losing party. In re Niles Trust, 176 N.J. 282, 294 (2003). "The purposes behind the American Rule are threefold: (1) unrestricted access to the courts for all persons; (2) ensuring equity by not penalizing persons for exercising their right to litigate a dispute, even if they should lose; and (3) administrative convenience." Ibid.

The Court, however, has "created carefully limited and closely interrelated exceptions to the American Rule[.]" In re Estate of Vayda, 184 N.J. 115, 121 (2005). One such exception permits the successful plaintiff in a legal malpractice action to recover the attorneys' fees incurred in prosecuting that action, because those are damages proximately caused by the attorney's negligence. Ibid. (citing Saffer, supra, 143 N.J. at 271).

The Court subsequently "extended the limited exception allowing the recovery of attorneys' fees in attorney malpractice actions . . . to include actions for attorney misconduct[.]" Ibid. (citing Packard-Bamberger, supra, 167 N.J. at 443). In

---

[16] Defendants do not challenge the amount of the fee awards or the judge's methodology in calculating the awards.

Packard-Bamberger, the defendant, who was both a corporate director of, and legal counsel to, the plaintiffs, "committed intentional misconduct in his role as counsel." Packard-Bamberger, supra, 167 N.J. at 442. The Court said

> [s]tated plainly, an attorney who intentionally violates the duty of loyalty owed to a client commits a more egregious offense than one who negligently breaches the duty of care. A client's claim concerning the defendant-attorney's breach of a fiduciary duty may arise in the legal malpractice context. Nonetheless, if it does not and is instead prosecuted as an independent tort, a claimant is entitled to recover attorneys' fees so long as the claimant proves that the attorney's breach arose from the attorney-client relationship. Accordingly, we hold that a successful claimant in an attorney-misconduct case may recover reasonable counsel fees incurred in prosecuting that action.
>
> [Id. at 443.]

However, the Court also said that "a plaintiff must demonstrate the existence of an attorney-client relationship as a prerequisite to recovery." Id. at 443.

The Court subsequently explained the expansion of this exception to the American Rule as having its "focus on the recovery of attorneys' fees as damages directly and proximately arising from the attorney's breach of fiduciary duty to the plaintiff." Estate of Vayda, supra, 184 N.J. at 122 (emphasis added). In In re Estate of Stockdale, 196 N.J. 275, 307 (2008),

the Court described its holding in Packard-Bamberger as permitting the recovery of counsel fees "in claims against attorneys who intentionally violate their fiduciary duties[.]" (Citing Packard-Bamberger, supra, 167 N.J. at 443). And, in Litton Industries, Inc. v. IMO Industries, Inc., 200 N.J. 372, 405 (2009), the Court described Saffer and Packard-Bamberger as examples of "a tightly circumscribed common law exception to the American Rule that defies ready description, but may be titled loosely as fiduciary malfeasance cases[.]"

We conclude that although no reported case specifically extends Saffer's exception to the American Rule to a suit brought against an attorney by a non-client, attorney's fees should be awarded in this case as a direct and proximate result of defendants' actions. Saffer, supra, 143 N.J. at 272; Lieberman, supra, 84 N.J. at 341. To hold otherwise would essentially eviscerate the very purpose of the exception to the American Rule by denying plaintiffs a full award for the consequential damages suffered as a result of defendants' actions.

The attorney fee award is particularly appropriate in this case, since defendants were holding Victoria's passport in trust and knew Innes and his attorney were relying upon the Agreement.

Nevertheless, they intentionally violated the Agreement and gave the passport to Carrascosa upon her request.

We affirm that portion of the judgment that reflects the award of counsel fees to Innes. Because we have reversed the judgment on behalf of Victoria, she is not a prevailing party, and therefore is not entitled to an award of fees. We vacate that portion of the judgment.

## III.

We next consider defendants' claim that it was error to sever their third-party complaint against Carrascosa from trial and to dismiss the complaint with prejudice after trial. The trial judge raised the severance issue sua sponte and provided all parties with an opportunity to address the issue several months before the trial began.

In a short written opinion dated February 18, 2011, the judge decided severance was appropriate "for the convenience of the parties, and to avoid prejudice to . . . Carrascosa." The judge noted that defendants were being represented at trial by Walter Lesnevich, a principal in the Lesnevich firm and husband of Marzano-Lesnevich. Relying on RPC 1.9, the judge determined that Lesnevich was disqualified from representing defendants in litigation against their former client, Carrascosa. The judge concluded that defendants would not be prejudiced by a severance

because they were able to present their defense at trial, and, if successful, the contribution claim against Carrascosa would "evaporate." If unsuccessful, defendants were free to pursue their contribution claim at a second trial represented by other counsel.

Rule 4:38-2(a) provides that a court may order a separate trial of any claim for the convenience of the parties or to avoid prejudice. "[O]ur Rules vest the determination whether or not to sever claims to the sound exercise of a trial court's discretion." Rendine, supra, 141 N.J. at 310 (citing R. 4:38-2(a)).

"RPC 1.9(a) plainly provides that [a] lawyer who has represented a client in a matter shall not thereafter represent another client in the same or substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing." City of Atlantic City v. Trupos, 201 N.J. 447, 451 (2010). Matters are considered "substantially related" if

> (1) the lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent representation of parties adverse to the former client, or

> (2) facts relevant to the prior representation are both relevant and material to the subsequent representation.
>
> [Id. at 467.]

Subject to certain exceptions that do not apply here, "[w]hen lawyers are associated in a firm, <u>none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by . . . RPC 1.9</u> [.]" RPC 1.10(a).

Here, the judge did not mistakenly exercise his discretion by severing defendants' contribution claim against Carrascosa. Lesnevich clearly could not represent defendants in a "substantially related matter in which" defendants' interests were "materially adverse" to those of their former client.

In the end, however, the severance decision was immaterial because the judge ultimately dismissed defendants' contribution claim against Carrascosa. In his written opinion, citing Blazovic v. Andrich, 124 N.J. 90 (1991), the judge concluded that any apportionment of fault was inappropriate because defendants had a duty to prevent the "specific misconduct" of their client. As the judge explained:

> As a result of the attorney-client relationship between . . . Carrascosa and the defendants, a relationship that derives its genesis from Victoria's passport and the attendant ramifications arising from that document, the Lesnevich firm was also charged with preventing any harm from befalling Peter and Victoria Innes. The

64

> jury verdict was issued in accordance with this notion. All of these factors therefore coalesce to place . . . Carrascosa outside the boundaries of the traditional joint tortfeasor realm.

Defendants argue before us that they are entitled to contribution from Carrascosa under the JTCL. We disagree and affirm the judge's dismissal of defendants' third-party complaint for contribution.

Pro rata apportionment of liability among negligent and intentional tortfeasors is appropriate based upon the "percentages of fault assigned by the trier of fact." Blazovic, supra, 124 N.J. at 105, 107-12. However, an exception to the general rule applies "when the duty of one encompassed the obligation to prevent the specific misconduct of the other." Id. at 111 (citing Butler v. Acme Markets, Inc., 89 N.J. 270 (1982)).

Application of this exception relies upon both the foreseeability of the "specific misconduct" and its "adequate causal relationship" to the duty imposed on the other tortfeasor to prevent it. Id. at 112. See e.g., Waldron v. Johnson, 368 N.J. Super. 348, 349-50, 352 (App. Div.) (rejecting the Blazovic exception where the plaintiff's recovery against a shopping mall for an assault at an automatic teller machine "was not so foreseeable nor did it bear such a close causal connection to

65

the [m]all's slow response to the melee that it should justify imposing upon the [m]all the entire responsibility for [the] plaintiff's injuries"), <u>certif. denied</u>, 182 <u>N.J.</u> 139 (2004); <u>Martin v. Prime Hospitality Corp.</u>, 345 <u>N.J. Super.</u> 278, 292 (App. Div. 2001) (holding that the plaintiff's sexual assault in the defendant's hotel was "neither sufficiently foreseeable nor sufficiently related to [the hotel's] alleged fault to justify imposing responsibility on [the hotel] for all of the [plaintiff's] injuries").

Here, the judge correctly held that the <u>Blazovic</u> exception applied. Defendants were fully aware of the Agreement and assumed a duty to safeguard Victoria's passport. Because they released the passport to Carrascosa without notice to Innes or his attorney, defendants failed to prevent the "specific misconduct" that enabled Victoria's removal to Spain. Moreover, based upon the evidence adduced at trial, that specific harm was entirely foreseeable.

IV.

The balance of defendants' arguments lack sufficient merit to warrant extensive discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E). Conk was clearly qualified to render the opinions he gave at trial, and the judge did not mistakenly exercise his discretion in so ruling. <u>See</u> <u>Koseoglu v. Wry</u>, 431 <u>N.J. Super.</u>

66

140, 159 (App. Div.) (quoting <u>Carey v. Lovett</u>, 132 <u>N.J.</u> 44, 64 (1993)), ("'[T]he competency of a witness to testify as an expert is remitted to the sound discretion of the trial court. Absent a clear abuse of discretion, an appellate court will not interfere with the exercise of that discretion.'"), <u>certif. denied</u>, 216 <u>N.J.</u> 4 (2013).

Defendants cannot assert prejudice when they provided the judge with a proposed charge that contained an improper statement of the law regarding proximate cause, and then commented on it extensively in summation. Although the judge did not discern the error until afterwards, he properly exercised his discretion and gave the jury a curative instruction.

In sum, we affirm the judgment in all respects as it applies to Innes. We reverse the judgment in all respects as it applies to Victoria, and remand the matter to the Law Division for entry of judgment in defendants' favor as to her claims. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

67                                                          A-0387-11T1